308 Ga. 543
FINAL COPY

S20A0265. ROBINSON v. THE STATE.

PETERSON, Justice.

Herbert Robinson appeals his convictions for malice murder, armed robbery, and possession of a firearm during the commission of a felony in connection with the death of Michael Moore.[1] He argues that the trial court erred by allowing the State to use two firearms for demonstrative purposes during trial, and by allowing

---

[1] The crimes occurred on August 18, 2016. On January 9, 2017, Robinson was indicted for malice murder, felony murder, aggravated assault, armed robbery, and possession of a firearm during the commission of a felony. Although Robinson was 16 years old at the time of the crimes, he was prosecuted as an adult. Following a jury trial on June 27 to 29, 2018, Robinson was found guilty on all counts. The trial court sentenced Robinson to serve life in prison for malice murder, a consecutive sentence of life in prison for armed robbery, and five consecutive years for possession of a firearm during the commission of a felony; the trial court determined that the felony murder and aggravated assault counts were vacated by operation of law, but in fact the aggravated assault count, predicated on Robinson shooting Moore, merged into the malice murder conviction. See *Culpepper v. State*, 289 Ga. 736, 738 (2) (a) (715 SE2d 155) (2011). Appellant filed a motion for new trial on July 11, 2018, which he subsequently amended through new counsel. A motion hearing was held on April 30, 2019; the trial court denied Robinson's motion as amended on May 21, 2019. Appellant filed a notice of appeal on May 31, 2019. This case was docketed to this Court's term beginning in December 2019 and submitted for a decision on the briefs.

body-camera footage to be shown at trial. He also argues that his trial counsel was ineffective for failing to object to a letter written by Robinson's cellmate being available to the jury for review during deliberations and for failing to object to a visual aid used by the State during closing arguments. Because Robinson has failed to show ineffective assistance of counsel or reversible error by the trial court, we affirm.

Viewed in the light most favorable to the jury's verdicts, the trial evidence showed the following. Moore lived in an apartment with his wife, Dawn, and their two children. He primarily stayed home to watch his two children while Dawn worked, but he earned some money cleaning firearms and repairing cell phones. He owned an AR-15 with a laser scope that he kept in his bedroom and treated "like his baby."

On the evening of August 18, 2016, Keon Wilcox and Robert Murphy were hanging out at a ball field adjacent to their apartment complex when they were approached by Robinson, who was 16 years old. He asked the others to walk with him to "get something fixed,"

and they agreed; Robinson said their destination was "right up the road," but he did not specify the location. Wilcox and Murphy testified that they did not know where Robinson was leading them. Around 9:00 p.m., the three men walked to the Moores' home, and Robinson knocked on the door. Dawn opened the door and saw Robinson, with two other young men standing further behind him.

Robinson introduced himself as "Kilo," but Dawn recognized Robinson because he had come by the house a few days prior, introducing himself as "Mookie." Robinson said he needed to talk to Moore, so Dawn went upstairs where Moore was in bed, and told him that someone was asking for him, and that the person said it was important; Moore went downstairs to talk to Robinson.

When Moore came to the door, Robinson took out a small handgun and asked Moore to clean it.[2] Moore took the handgun back into the house, then went to the bedroom and asked Dawn for his

_____

[2] Wilcox and Murphy testified that they were unaware that Robinson had a gun until they approached the Moores' house. Neither Wilcox nor Murphy was armed; neither was charged as an accomplice; and Robinson has not argued at trial or on appeal that they were involved in the crimes.

gun cleaning kit. Dawn told him where the kit was, and he left the bedroom and cleaned the gun. When Moore brought the cleaned gun out to Robinson, Moore threw one of the bullets away in the yard because he said the bullet was "bad." Robinson replied, "give my bullet back," and replaced the bullet in the gun before putting the gun in his pocket.

Moore and Robinson talked for a while, and Robinson said he wanted to see Moore's AR-15 to "show my homeboys the beam on the gun." Dawn heard Moore reenter the house and grab something from the bedroom, but Dawn didn't see what was taken.

Moore brought out his AR-15 for Robinson to see, and demonstrated the laser sight on the gun. Robinson asked to use the laser sight, and Moore agreed, handing Robinson the AR-15. Robinson played with the gun's laser sight, shining the light up into the trees. During this time, Murphy stepped to the side of the house to urinate, and Wilcox walked away from the house to look up at the light. Then, Wilcox saw Robinson take the handgun out of his pocket and shoot Moore in the chest. From the bedroom, Dawn heard a loud

pop. Robinson said, "I told y'all I'd do this sh*t," as he and the other two separately fled the scene.

As he fled the scene, Robinson called Teresa Porter. During the call, Robinson said, "Teresa, I just killed – I just shot somebody. Can you come pick me up?" Porter declined to do so, because she thought he was joking. But Robinson again said, "I just shot somebody. Don't you hear the sirens?" Even though Porter heard sirens, she didn't believe that Robinson was telling her the truth at that time.

Moore stumbled back into his apartment and fell into the hallway. Dawn came out from the bedroom and saw him lying face down on the living room floor. She called 911 and attempted to render aid, but could not flip him onto his back. Emergency personnel also attempted to help Moore, but he died as a result of the gunshot wound. Dawn realized that the AR-15 was no longer hanging in its usual place on their bedroom wall, so she reported it as missing to responding police officers. In the front yard, crime scene personnel collected a shell casing from a .380 handgun. Crime scene personnel searched the house and surrounding areas, but

could not find the AR-15.

Dawn independently searched Facebook to identify the man who was at her door that night. She recalled that Robinson had previously identified himself as Mookie, and found a Facebook profile for "Skoolboy Mookie." She confirmed that the photo depicted the man she saw at her door, and texted a screenshot of the photo to the GBI agent who had interviewed her about the shooting. At trial, Dawn identified Robinson as the man who came to her house the night of the shooting.

After the shooting, Wilcox and Murphy ran. Later that night, Wilcox talked to his mother and then his great-uncle about what had happened. Wilcox's great-uncle, who was in law enforcement, contacted the GBI, and Wilcox went to the police station and gave a statement. Following Wilcox's statement, police made contact with Murphy. Murphy initially denied being present at the shooting, but later admitted that he was there. Both Wilcox and Murphy spoke with law enforcement on the night of the shooting. After speaking with Wilcox and Murphy, law enforcement began looking for

Robinson, and located him about a month later in an apartment in Waycross. Robinson was arrested and placed into custody at the Ben Hill County Jail.

While in custody, Robinson approached fellow inmate, Anthony Cobb, seeking legal advice. Robinson introduced himself to Cobb as "the guy that killed that white dude across town." Robinson told Cobb that he and his friends wanted to commit a home invasion, so they went to a home and knocked on the door. He explained that when the "white dude" stepped out on the porch, they began to talk about an AR-15. He told the victim that he didn't believe the gun was real, so the victim brought the gun out and gave it to Robinson to see. Robinson said he refused to give the AR-15 back, he and the victim struggled over the AR-15, and Robinson ultimately shot the victim with his own gun. Cobb talked to law enforcement about this discussion; when Robinson found out, he threatened Cobb's life.

A medical examiner determined that Moore was shot once in the right upper chest just below his clavicle. The entrance wound showed gunpowder stippling, which indicated an intermediate or

close-range gunshot, estimated to be two to three feet away from the victim. The medical examiner retrieved a .380 bullet. Besides the gunshot wound, Moore did not have any significant injuries indicating a fight, although he did have some bruising on his arms and legs. Moore's cause of death was determined to be a single gunshot wound to the chest.

1.    Robinson does not challenge the sufficiency of the evidence. Nevertheless, as is our customary practice in murder cases, we have independently reviewed the record and conclude that the evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Robinson was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2.    Robinson argues that the trial court erred in two respects: (a) by allowing the State to use firearms as demonstrative aids, and (b) by allowing the State to introduce two body-camera videos.

(a)    The State's ballistics expert testified that the crime lab determined that the bullet extracted from Moore's body was a .380

metal jacketed bullet that could have been fired from one of six brands of .380 pistols that all generally worked the same way. The expert testified that she did not receive any firearms in this case and that she did not compare firearms to the bullet. The State then presented a .380 semiautomatic pistol and an AR-15 rifle to the jury "for demonstrative purposes only." Robinson objected to the presentation of both guns, arguing under OCGA § 24-4-403 ("Rule 403") that the sample guns could mislead the jury into thinking the demonstrative guns were the guns from the crime, when in fact, the actual guns were never recovered. Robinson also argued that the AR-15 demonstration was cumulative because photos of Moore's AR-15 were in evidence. The State responded that the demonstration of the .380 pistol was relevant to show malice aforethought by demonstrating the steps required to insert a magazine, chamber a round, and apply pressure to pull the trigger and fire the gun. The State argued that the AR-15 was relevant to rebut the defense theory that the AR-15 was a fiction in the State's case because the State did not have hard evidence of it. The State argued that the size

of the weapon tended to prove that Dawn would have noticed that the gun went missing immediately and that it wasn't the sort of firearm that would have been misplaced or mistaken for a different weapon. Finally, the State argued that demonstration of the differences between the two firearms and the ammunition they both require was relevant to show the jury that the weapons could not have been confused for each other, and the ammunition was not interchangeable.

The court allowed the State's expert to present the guns and gave the following limiting instruction to the jury:

> Members of the jury, this weapon that is being presented is for demonstrative use only. It does not in any way say that this is a weapon that was used in any way in this case. It's just for demonstration purposes so understand that.

Robinson claims that this was error, arguing that the probative value of the display was outweighed by the likelihood that the display would confuse the jury regarding the facts and issues presented to them for consideration. We disagree.

A trial court has wide discretion in admitting demonstrative

evidence, and a party offering such evidence must "lay a proper foundation establishing a similarity of circumstances and conditions." *Smith v. State*, 299 Ga. 424, 435 (3) (b) (788 SE2d 433) (2016) (citation and punctuation omitted). This requires showing "not that the conditions of the demonstration are identical to the actual event at issue, but that they are so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." *Rickman v. State*, 304 Ga. 61, 64 (2) (816 SE2d 4) (2018) (citation and punctuation omitted). Like any evidence, demonstrative evidence is subject to Rule 403, and should be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Applying these rules, we see no abuse of discretion in the trial court's admission of the demonstrative firearms. The State's expert laid a foundation by explaining that the bullet found in Moore's body came from a .380 pistol, and that the demonstrative pistol was one of six guns that the bullet could have been fired from. The AR-15

was the same type of weapon that went missing the night of the murder. The State's expert explained how the demonstrative AR-15 could have been modified by adding attachments to match the description of the missing AR-15. This testimony was sufficient to lay a foundation of similarity.

The State argued, and the trial court accepted, that the demonstration was at least somewhat probative to support the State's theory of the case and rebut the defense theory. The only potential prejudice that Robinson points to is jury confusion over whether the guns displayed in court were actually the guns used in the commission of the alleged crimes. The State, the State's expert, Robinson, and the court all emphasized that the firearms used at trial were not the actual firearms used in the alleged crimes, and that the firearms associated with the alleged crimes were never recovered. The statements made by both parties and the court ameliorated the risk of jury confusion. See *United States v. Aldaco*, 201 F3d 979, 986-987 (7th Cir. 2000) (prejudice is minimized when government made clear to the jury that the replica was not the

actual weapon possessed by the defendant).  Robinson has failed to show that the trial court abused its discretion in allowing the State to use the firearms as demonstrative aids.

(b)    Robinson also claims that the trial court abused its discretion in allowing two body-camera videos to be shown at trial. At trial, the State made two separate presentations of body-camera footage recorded by police officers involved in the response and investigation of the alleged crimes.

The first video was taken by an officer during Robinson's arrest and shows the process of taking Robinson into custody. It shows officers with weapons drawn, encountering Robinson lying on the floor, placing handcuffs on Robinson, and leading him into a police vehicle. The arresting officer testified throughout the presentation of the video about what was occurring during the arrest. The video was fast-forwarded to avoid playing certain portions of the video and hearsay. The second video depicts the crime scene in the minutes immediately following the shooting of Moore. The video shows Moore in his home, lying in a pool of blood, with Dawn attempting to stop

his blood loss while in extreme emotional distress. The video also shows the police officer removing Moore's two young children from the house, placing the children in a police vehicle, and attempting to comfort the children, who also appear to be in extreme distress. Robinson objected to the playing of both videos.

> The admissibility of crime scene photographs and video-recordings is generally governed by OCGA § 24-4-401, which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"; by OCGA § 24-4-402, which provides that "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules"; and by OCGA § 24-4-403. . . . Decisions regarding relevance are committed to the sound discretion of the trial court and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly.

*Morgan v. State*, 307 Ga. 889, 894 (3) (838 SE2d 878) (2020) (citations and punctuation omitted). Accordingly, body-camera video must be relevant and probative, and its probative value must not be substantially outweighed by any unfair prejudice. We will address each video in turn. Distinct portions of the same video will be treated

as separate videos for the purposes of our review. See id.

(i)     Robinson argues that the trial court abused its discretion in playing the arrest video because it provided no information that was not otherwise available through prior testimony and violated Robinson's right to be free of indicia of guilt while in the presence of the jury. The video showed officers with weapons drawn, placing handcuffs on Robinson and leading him into a police vehicle.

The State argues that the arrest video was relevant because Robinson's flight demonstrated consciousness of guilt. See *McClain v. State*, 303 Ga. 6, 9 (1) (810 SE2d 77) (2018) (flight from the crime scene reflects consciousness of guilt). The State also argues that the video was relevant to show Robinson's demeanor to rebut his argument that he was a scared 16-year-old who ran away in panic and to corroborate officer testimony.

The arrest took place over a month after Moore's death, and the video did not show Robinson's flight; it did not provide any evidence of Robinson's guilt or demeanor at the time he fled to

Waycross. But even if the trial court abused its discretion in admitting the arrest video, any error was harmless. "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kirby v. State,* 304 Ga. 472, 478 (3) (c) (819 SE2d 468) (2018) (citation and punctuation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Kirby*, 304 Ga. at 478 (3) (c) (citation and punctuation omitted).

The jury heard testimony that Robinson was arrested for murder and also saw him sitting at the defendant's table. And given the compelling evidence against Robinson described above, including eyewitness testimony and Robinson's own inculpatory statements, it is highly probable that the arrest video alone did not contribute to the verdict. See *Morgan*, 307 Ga. at 898 (3) (e).

(ii)   Next, Robinson argues that the trial court abused its discretion in playing the crime scene video because it had no probative value, and that its only purpose was to inflame the jury's prejudice against him. Specifically, he argues that the video was unnecessary to establish any new evidence for the jury, as the State established Moore's identity within the first five minutes of trial, and the State elicited detailed descriptions of the crime scene from witnesses.

The portion of the video showing Moore lying in his home, while gruesome, was relevant to show his location and condition immediately following the shooting. It was also relevant to corroborate the witness testimony regarding the condition of the crime scene and Dawn's testimony regarding her attempts to tend to Moore. See *Davis v. State*, 306 Ga. 140, 145 (3) (b) (829 SE2d 321) (2019) (video of deceased victim relevant to show manner of death and to corroborate witness testimony). Robinson points only to Rule 403 to support his claim, but other than noting the gruesome nature of the video, he fails to explain how this portion of the video was

unfairly prejudicial to him. "[P]hotographic evidence that fairly and accurately depicts a body or crime scene and is offered for a relevant purpose is not generally inadmissible under Rule 403 merely because it is gruesome." *Plez v. State*, 300 Ga. 505, 508 (3) (796 SE2d 704) (2017). The same is true of crime scene videos. *Davis,* 306 Ga. at 145 (3) (b) (applying *Plez* to gruesome videos of deceased victim); see also *Varner v. State*, 306 Ga. 726, 729 (2) (a) (832 SE2d 792) (2019) (prejudice of video showing victim lying on ground with blood flowing from head did not outweigh probative value of showing crime scene and victim's injuries and corroborating witness testimony). It is a close call, because the video had limited probative value, but Robinson has not shown that the probative value of the video was substantially outweighed by the unfair prejudice of the video. Thus, Robinson has not shown that the trial court abused its discretion in admitting this portion of the video.

By contrast, the last three minutes of the video showed little of the home and yard, nothing of Moore, and focused primarily on the emotional turmoil of Moore's five-year-old daughter and seven-year-

old son. In this portion of the video, the officer picks up the crying children and takes them outside to a patrol car. The young children asked the officer, "who shot my daddy?" and repeatedly said, "I want my daddy." The prosecutor repeated these requests and questions from the children in opening and closing arguments and acknowledged to the jury the prosecutor's purpose in introducing the evidence:

> I just want to stir your emotion? Yeah, I do. There's no bones about it because I want you to feel the emotion that Dawn Moore felt. I want you to feel the emotion that [Moore's son] felt, that [Moore's daughter] felt, as their daddy lay gunned down six feet away from them by that man sitting right there.[3]

This portion of the video did not have even the remotest shred of

---

[3] Robinson's counsel raised no objection to this clearly inappropriate argument, which would have been objectionable even without the accompanying body-camera video. See *Martin v. State*, 298 Ga. 259, 280-281 (7) (c) (779 SE2d 342) (2015) (State's argument urging the jury to "embrace" and "feel" compassion for the victims was inappropriate, because "'compassion' for the victims should have played no part in the jury's decision"), disapproved of on other grounds by *Willis v. State*, 304 Ga. 686, 706 n. 3 (820 SE2d 640) (2018); see also *Smith v. State,* 288 Ga. 348, 355–356 (10) (b) (703 SE2d 629) (2010) ("[W]e must remind all prosecutors in this State that it is not their job to pursue stunts and antics during their closing arguments that are designed merely to appeal to the prejudices of jurors[.]").

relevance. See *Morgan*, 307 Ga. at 896 (3) (b) (video of police officer attempting to revive drowned child victim did not have probative value). Even viewing the video in the light most favorable to admission, there was no conceivable probative value to the video, so the probative value was substantially outweighed by the danger of unfair prejudice from its emotionally charged content. Admitting the last three minutes of the recording was plainly an abuse of discretion, particularly when considered in light of the State's problematic closing argument. Id. at 897-898 (3) (d).

We have reviewed the trial transcript de novo to assess whether the trial court's abuse of discretion was likely to affect the jury's verdict. See *Kirby*, 304 Ga. at 478 (3) (c). Our review of the trial transcript reveals that the video was admitted for no purpose other than to inflame the prejudice of the jury. The prosecutor went so far as to tell the jurors that he showed this portion of the video for its emotional impact. Compare *Morgan,* 307 Ga. at 895-898 (3) (a)-(e) (video of officers performing CPR on a child's lifeless body was harmless despite significant prejudice when the video was

introduced to show the manner of the child's death, the state of the home where the child was found, and the deliberate nature of her killing). It is more likely that harm resulted from the video's erroneous admission when the video had no other purported purpose. On the other hand, the trial court instructed the jury that closing argument was not evidence and that they should not "show favor or sympathy to one party or the other," and of course, qualified jurors are presumed to follow trial court instructions.[4] See *Womac v. State*, 302 Ga. 681, 683 (2) (808 SE2d 709) (2017). And the video played a minor role in the State's case, given the evidence against Robinson. The evidence of Robinson's guilt was particularly strong, including (1) Wilcox's testimony that he saw Robinson shoot Moore, (2) Dawn and Murphy's testimony corroborating much of Wilcox's testimony, (3) Robinson's statements to Porter on the night of Moore's death that he "just shot somebody," (4) Robinson's statements to Cobb confessing to the crime, and (5) Robinson's flight.

---

[4] This is not to suggest that the judge should not have stopped the prosecutor's objectionable argument, but Robinson does not challenge this on appeal.

This case is a close call due to the complete lack of probative value for which this video could have been admitted, but ultimately, we conclude that the admission of this portion of the video was harmless in the light of the compelling evidence of Robinson's guilt.[5]

3. Robinson also argues that his trial counsel was ineffective in two ways. We disagree.

For Robinson to prevail on either of his ineffectiveness claims, he must show both that trial counsel's performance was constitutionally deficient and that Robinson was prejudiced by this deficient performance. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984); *Mims v. State*, 304 Ga. 851, 854-855 (2) (823 SE2d 325) (2019). "To establish deficient performance, [Robinson] must overcome the strong presumption

---

[5] Our conclusion remains the same even after considering the harm caused by this erroneous admission in the light of the trial court's lesser error in admitting the arrest video. See *State v. Lane*, 308 Ga. 10, 13 (1) (838 SE2d 808) (2020).

Although we hold in this case, as we did in *Morgan*, that the other evidence of the defendant's guilt was strong enough to render harmless the erroneously admitted portions of an officer's body-camera video recording, that will not always be so. The admissibility of these sorts of recordings — and each portion of them — must be considered with care.

that his . . . counsel's conduct falls within the broad range of reasonable professional conduct and show that his counsel performed in an objectively unreasonable way" in the light of all of the circumstances. *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015) (citation and punctuation omitted). To establish prejudice, Robinson must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Robinson must satisfy both prongs of the *Strickland* test, and if he fails to establish one prong, we need not examine the other. See *Smith*, 296 Ga. at 733 (2). In reviewing either component of the inquiry, all factual findings by the trial court will be affirmed unless clearly erroneous. Id.

(a) Robinson claims his trial counsel was ineffective for failing to object to the letter written by fellow inmate Anthony Cobb being made available to the jury for review during deliberations.[6]

---

[6] In the handwritten letter, Cobb asked to talk with the State about a murder case in exchange for help getting out of jail. He said that Robinson told him

Robinson argues that sending this letter out with the jury was a violation of the "continuing witness rule." Robinson is wrong. Cobb's letter was "not written testimony and did not derive its evidentiary value solely from the credibility of its maker. Instead, it was original documentary evidence, and was properly allowed to go out with the jury." *Foster v. State*, 294 Ga. 383, 385 (5) (754 SE2d 33) (2014) (citation and punctuation omitted); see also *Young v. State*, 292 Ga. 443, 446 (3) (b) (738 SE2d 575) (2013) (a letter from jailhouse informant did not violate continuing witness rule because it "was original documentary evidence of the attempts by the informant to provide information to the district attorney," not "the reduction to writing of an oral statement, nor was it a written statement provided in lieu of testimony"). Because the trial court properly would have overruled a continuing witness objection, trial counsel was not deficient for failing to raise such an objection, and thus was

---

everything that happened the day of the murder. Cobb's letter also stated, consistent with his testimony at trial, that he feared for his life because Robinson told members of the Bloods gang that Cobb's name appeared in documents related to Robinson's case.

not ineffective. See *Grier v. State*, 305 Ga. 882, 886 (2) (a) (828 SE2d 304) (2019) (trial counsel is not ineffective for failing to object when such objection would be without merit).

(b) Robinson also claims that trial counsel was ineffective for failing to object to aspects of a visual aid used by the State in closing arguments. In particular, Robinson claims that the visual aid was objectionable due to its use of a photo of him, certain testimony elicited during trial, and the word "guilty."

The visual aid is not in the record. At the motion for new trial hearing, trial counsel testified the visual aid consisted of "a picture of [Robinson]'s Facebook profile," with the word "guilty" underneath it, along with "phrases attributed to him by witnesses saying things . . . that were incriminatory, incriminating." Counsel said he specifically recalled some of the statements on the visual aid, but was unsure of others, explaining, "[m]y memory's a little fuzzy 'cause it was about a year ago and it was not up there for very long."[7] On

---

[7] Counsel testified, "I specifically recall, 'This is the sh*t I do,' and I think, 'I just shot that man.' I do not recall if the longer phrase was included."

cross-examination, trial counsel testified that all the statements on the screen were statements that came into evidence through the testimony of witnesses during the course of the trial. But on appeal, Robinson argues that the visual aid included "unsubstantiated claims" and "blended facts, inferences, and speculation from trial."

The State conceded in its briefs that in its closing arguments, it "argued the evidence proves that the appellant is guilty and placed that word on a slide with his Facebook picture which was admitted into evidence." But the State maintained that all the phrases from the slide were admitted into evidence during the course of the trial. The entirety of the exact statements included on the slide is not in the record. "[W]here the transcript does not fully disclose what transpired in the trial court, the burden is on the complaining party to have the record completed pursuant to OCGA § 5-6-41. . . . When this is not done, there is nothing for the appellate court to review." *Glass v. State*, 289 Ga. 542, 545 (2) (712 SE2d 851) (2011) (citations and punctuation omitted). For the purposes of this appeal, we can rely only on what is in the record and what has been conceded — the

use of the word "guilty" and Robinson's Facebook photo, which had previously been admitted into evidence, and some additional statements by Robinson that had already separately been admitted into evidence.

"[T]o establish that trial counsel was deficient, [Robinson] has to show that no reasonable attorney would have failed to object to the prosecutor's argument." *Chavez v. State*, 307 Ga. 804, 811 (2) (b) (837 SE2d 766) (2020) (citation and punctuation omitted). "Whether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance." *Smith*, 296 Ga. at 735-736 (2) (b) (citations and punctuation omitted). "[I]n the absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." *Washington v. State*, 285 Ga. 541, 543 (3) (a) (i) (678 SE2d 900) (2009).

Co-counsel testified at the motion for new trial hearing that

they did not object due to timing, as the visual was up for only a short period at the very end of the State's closing argument. Again, it can be reasonable strategy on the part of trial counsel to remain silent during closing arguments and "allow the potentially inappropriate antics of the prosecutor to backfire." *Smith v. State*, 288 Ga. 348, 356 (10) (b) (703 SE2d 629) (2010). See also *Anderson v. State*, 350 Ga. App. 369, 382 (4) (c) (i) (829 SE2d 453) (2019) (court will not second-guess trial counsel's decision "not [to] object during closing arguments unless the remarks are egregious"). Robinson has not shown that it was patently unreasonable for his trial counsel not to object to the prosecutor's visual aid. Accordingly, he has not shown ineffective assistance of trial counsel in this regard.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 20, 2020.
Murder. Ben Hill Superior Court. Before Judge Chasteen.
*Conger & Smith, Gregory D. Smith*, for appellant.
*Bradford L. Rigby, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.