312 Ga. 452
FINAL COPY

S21A0638.  CRAWFORD v. THE STATE.

NAHMIAS, Chief Justice.

Appellant Gerrod Crawford was convicted of felony murder and other crimes related to the shooting death of Antonio McBride. On appeal, he contends that the trial court should have granted his motion for a directed verdict of acquittal and that his trial counsel provided ineffective assistance by failing to make a timely objection to an improper statement made by the prosecutor during her closing argument. We affirm.[1]

---

[1] The crimes occurred on November 3, 2015. In June 2016, a Fulton County grand jury indicted Appellant and Kahreek Flowers for malice murder, two counts of felony murder, criminal attempt to commit armed robbery, aggravated assault, and possession of a firearm during the commission of a felony. Appellant was also indicted for possession of a firearm by a first offender probationer and felony murder based on that offense. Flowers pled guilty to murder and testified at Appellant's trial. Appellant was tried from March 19 to 23, 2018; the jury found him not guilty of malice murder but guilty of the other charges. On March 30, the trial court sentenced Appellant to serve life in prison for felony murder based on aggravated assault and ten concurrent years in prison for attempt to commit armed robbery, plus five suspended years in prison for each firearm count. The remaining counts were merged or vacated

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In the early morning hours of November 3, 2015, Stanley Walcott drove Kahreek Flowers (who was "like a little brother" to Walcott), Appellant (Flowers's friend), Dayquan Johnson (Flowers's nephew), Jayda Carradine (Appellant's girlfriend), and Jabrea Watkins (Carradine's sister) from Jonesboro to the house of Walcott's drug dealer in Atlanta to buy some marijuana. While they were there, Antonio McBride, who was walking home from work, was killed nearby. He was shot three times, once in his back, once in his buttock, and once in his face. The two bullets found in his body were fired from the same gun.

At Appellant's trial, Johnson gave the following account of what happened when Walcott's car arrived at the dealer's house in

by operation of law. Appellant filed a timely motion for new trial, which he later amended with new counsel. In October 2020, after an evidentiary hearing, the trial court denied Appellant's motion. Appellant filed a timely notice of appeal to the Court of Appeals, which properly transferred the case to this Court. The case was docketed to our April 2021 term and submitted for a decision on the briefs.

Atlanta. Walcott went inside the house, while everyone else stayed in the car. After waiting for some time, Appellant got out of the car and "paced around the parking lot, looking upset." About five minutes later, Appellant saw someone coming and told Flowers to "come on." Flowers got out of the car, and Appellant and Flowers approached a man and "tried to rob" him. Appellant and Flowers, who each had a gun, appeared to pistol-whip the man. When the man fell to the ground at their feet, Appellant and Flowers pointed their guns at him. The man tried to get up, and Flowers shot him twice. The man started yelling, and Flowers shot him again. Appellant and Flowers then ran back to the car and got in, each still carrying a gun. Walcott returned to the car; Appellant told him, "come on, we got to go"; and Walcott got in the car and drove away.

Several months after the shooting, the police identified Flowers as a suspect. When he was interviewed by detectives on March 22, 2016,[2] Flowers initially said that Appellant alone got out of the car and beat and shot the victim. Flowers said that the encounter was a

---

[2] Part of the interview was audio-recorded and played for the jury.

3

"lick" (which a detective testified meant a robbery). After more questioning, however, Flowers said that he and Appellant were outside the car and about seven or eight feet away from the man when the man started "reaching as if he was about to grab something" and Flowers got scared and shot at the man two or three times. Appellant did not fire, but he pulled his gun to "back[ ] [Flowers] up."[3]

Walcott, Watkins, and Carradine also gave accounts of that night. None of them said that they saw Appellant with a gun or fighting anyone, but Walcott testified and Watkins told a detective that Appellant and Flowers got out of the car, there was at least one

---

[3] Flowers provided two additional accounts of the shooting. On September 12, 2016, Flowers wrote a statement for the police claiming that Appellant had been walking with Flowers outside the car, but left him to go to the bathroom. Flowers then "walked up on the victim," voices in Flowers's head told Flowers to "get him," and Flowers shot the victim. Appellant was not near Flowers or in any way involved in the shooting.

At trial, Flowers testified that when Walcott came out of the house and got in the car, Appellant had to use the bathroom, so he went around to the other side of the house. Then Flowers saw a man walking down the street, and Flowers and Walcott "ran up on him." Walcott hit the man, who ended up on the ground. Flowers declined to answer questions about how the man was shot or why Walcott wanted to approach the man.

4

gunshot, Appellant and Flowers then returned to the car, and the group drove away. Watkins also told the detective that before the gunshot, she heard Appellant and Walcott talking about robbing the drug dealer; after Appellant and Flowers returned to the car, Walcott asked, "did you bum him," and Flowers said something like "yeah, . . . we shot him" or "I shot him."[4] Carradine testified that she did not remember if Appellant and Flowers got out of the car, and she did not see or hear any shooting.

Appellant's video-recorded interview with a detective was played for the jury. Appellant claimed that Flowers and Walcott went into the house, while he, Watkins, and Carradine waited in the car;[5] Appellant did not hear anything unusual; and eventually, Flowers and Walcott got back in the car with marijuana and everyone drove away. The defense stipulated that Appellant was a

---

[4] Watkins gave the above account when she was interviewed by a detective on March 26, 2016. At trial, Watkins claimed that this account was a lie, which she told because she was scared. She testified that the group simply drove to Atlanta, could not get the drugs they wanted, and drove back to Jonesboro.

[5] Appellant did not initially include Johnson in the group. After the detective said that Johnson admitted being there, Appellant agreed that he was and claimed that he got out of the car with Walcott and Flowers.

5

first-offender probationer. Appellant did not testify or present any witnesses at trial. His defense was that Flowers was solely responsible for the shooting. Appellant moved for a directed verdict of acquittal as to all charges at the close of the State's evidence, which the trial court denied.

2. Appellant argues that the trial court erred by not granting his directed verdict motion. See OCGA § 17-9-1 (a).[6] We have explained that

> [t]he test established in *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979), is the proper test for us to use when a challenge to the sufficiency of the evidence arises from the denial of a motion for directed verdict. See *Humphrey v. State*, 252 Ga. 525, 527 (1) (314 SE2d 436) (1984). Under that test, we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson*, 443 U.S. at 319 (III) (B).

---

[6] OCGA § 17-9-1 (a) says:

Where there is no conflict in the evidence and the evidence introduced with all reasonable deductions and inferences therefrom shall demand a verdict of acquittal or "not guilty" as to the entire offense or to some particular count or offense, the court may direct the verdict of acquittal to which the defendant is entitled under the evidence and may allow the trial to proceed only as to the counts or offenses remaining, if any.

*Holmes v. State*, 307 Ga. 441, 443 (836 SE2d 97) (2019).

Appellant argues that he was entitled to a directed verdict of acquittal because Flowers admitted being the shooter and testified that Appellant was not involved in the shooting. Appellant also notes that Walcott, Watkins, and Carradine said that they did not see him holding a gun or fighting with the victim.

It is true that in two of his four stories, including the one he told at trial, Flowers said that Appellant was on the other side of the house going to the bathroom when the shooting happened, see footnote 3 above. However, Flowers initially said that Appellant alone attempted to rob and then shot the victim, and Flowers then told the detectives that Appellant had pulled a gun to back Flowers up when Flowers shot the victim.

> We leave to the jury the resolution of [such] conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences derived from the facts. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

*Boyd v. State,* 306 Ga. 204, 207 (830 SE2d 160) (2019) (citation and

7

punctuation omitted).

Moreover, Flowers's account that he and Appellant worked together during the armed attack was corroborated by Johnson's testimony that Appellant got out of the car with Flowers to try to rob the victim, pistol-whipped the victim, and pointed a gun at the victim before Flowers shot the victim. And while Walcott, Watkins, and Carradine claimed that they did not see Appellant with a gun, Walcott and Watkins heard at least one gunshot when Appellant was out of the car with Flowers, and Watkins heard Appellant talk about robbing someone. Thus, when properly viewed in the light most favorable to the verdicts, the evidence was legally sufficient to support Appellant's convictions, at least as a party to the crimes. See *Jackson*, 443 U.S. at 319. See also OCGA § 16-2-20 (b) (defining "party to a crime"); *Jackson v. State*, 303 Ga. 487, 489 (813 SE2d 372) (2018) ("Even where it is undisputed that the victim was shot by another person, every person concerned in the commission of the

crime may be convicted of the crime.").[7]

3. Appellant also claims that his trial counsel provided ineffective assistance by failing to object to the prosecutor's assertion in closing argument that if the jury found Appellant guilty of involuntary manslaughter, he would "get away." This claim fails.

(a) At Appellant's request, involuntary manslaughter (based on affray, simple battery, and simple assault) was listed on the verdict form as a lesser included offense of the murder counts.[8] During closing argument, the prosecutor discussed the involuntary manslaughter charge, arguing that the jury should find Appellant not guilty of that unindicted offense because the evidence showed that he and Flowers were intentionally attempting to rob McBride at gunpoint when the fatal shooting occurred. The prosecutor then

---

[7] We note that the jury was instructed on the definition of party to a crime.

[8] See OCGA § 16-5-3 (a) ("A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. A person who commits the offense of involuntary manslaughter in the commission of an unlawful act, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years.").

said:

> So there's a trick here, all right. Here's the trick. If you fill the [verdict] form out wrong, he gets off, it's called a technicality. Yeah, that's right. There is going to be a form, and if you fill it out incorrectly, he gets away. So, ladies and gentlemen, if your verdict is actually malice murder, guilty; or felony murder, guilty; do not write guilty on involuntary manslaughter, okay. I wish it wasn't this way. I wish there wasn't like a technicality where if somebody messes up a form and your true verdict is not given, but this [is] something we have to deal with. . . . [P]lease, if your verdict is guilty, write guilty on the appropriate line for the aggravated assault for the felony murder, because, literally, if you-all 12 people decide that, yes, he is guilty of the murder, but you write guilty on involuntary, that will be the verdict, a technicality, he will get away, that's all I'm saying.

Appellant's counsel did not object.

The trial court's final instructions to the jury included a discussion of how the jury should consider involuntary manslaughter:

> After consideration of all of the evidence, before you would be authorized to return a verdict of guilty of malice murder or felony murder, . . . you must determine whether mitigating circumstances, if any, would cause the offense to be reduced to involuntary manslaughter. A person commits involuntary manslaughter when that person causes the death of another human being without any intention to do so, by the commission of the offense of

10

one of the following offenses: affray, simple battery, or simple assault.

The court then defined those three misdemeanor offenses (which were not separately listed on the verdict form). The court also explained that it was the court's duty to instruct the jurors on the law and that jurors "are not to concern [them]selves with punishment."

After being instructed, the jury deliberated for a little less than an hour before being released for the day. Shortly after 9:00 the next morning, as the jury recommenced its deliberations, Appellant's attorneys raised an objection to the prosecutor's statement about involuntary manslaughter, acknowledging that the objection was untimely but explaining that they had consulted with someone in their "appeals department" overnight, who said that they should have objected. They argued that the prosecutor's statement that if Appellant was convicted of involuntary manslaughter, he would "go free" was a mischaracterization of the law, and they asked the trial court to clarify that a guilty verdict on any of the crimes "is a

11

conviction and there is no going free."

The court heard further argument about the objection and then reviewed the transcript of the closing argument. During this time, the jury sent a note asking to hear some of the evidence again. The jury was brought into the courtroom, and some witness statements were replayed. Before the jurors returned to their deliberations, the court advised them, without objection:

> One thing I wanted to tell you is that involuntary manslaughter, as well as all of the other charges on the indictment[,] are all felony charges. There was some dispute as to whether he would be getting off or something, but they're all felony charges and you need to be aware of that.

The jury then deliberated for another four-and-a-half hours before reaching its verdicts. Before the verdicts were read, Appellant's counsel moved for a mistrial based on the prosecutor's statement during closing argument, which the court denied. In its order denying Appellant's motion for new trial, the court ruled that the prosecutor's "getting away" argument was improper and thus objectionable, but trial counsel's deficient performance in not

12

objecting did not cause Appellant prejudice.

(b) We agree with the trial court that Appellant has failed to demonstrate prejudice.

> For [Appellant] to prevail on his ineffectiveness claim, he must show (1) that his trial counsel's performance was constitutionally deficient and (2) that he was prejudiced by counsel's deficient performance. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). If [Appellant] fails to establish one prong of the *Strickland* test, "we need not examine the other." *Robinson v. State*, 308 Ga. 543, 553 (3) (842 SE2d 54) (2020). To establish prejudice, [Appellant] "must show that there is a reasonable probability that, but for counsel's unprofessional error[ ], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. To determine whether [Appellant] has shown *Strickland* prejudice, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." *Swanson v. State*, 306 Ga. 153, 163 (2) (b) (829 SE2d 312) (2019) (citation and punctuation omitted).

*Draughn v. State*, 311 Ga. 378, 382-383 (858 SE2d 8) (2021).

The prosecutor's argument was obviously improper, and Appellant's trial counsel should have objected immediately. But Appellant has not shown that this deficient performance likely affected the outcome of his trial. Although the prosecutor's comments were not immediately corrected, the trial court

13

specifically advised the jury the next morning that involuntary manslaughter is a felony charge and Appellant would not be "getting off," and the jury continued to deliberate for about four-and-a-half hours after receiving that instruction. Also, before deliberations began, the jurors were instructed on how to consider the involuntary manslaughter charge and told that the court would instruct them on the law and that they should not concern themselves with punishment. Moreover, there was little if any evidence of involuntary manslaughter,[9] so the jury was unlikely to find Appellant guilty of that offense regardless of the prosecutor's misstatement.

Accordingly, Appellant's claim of ineffective assistance of counsel fails. See *Draughn*, 311 Ga. at 384 ("Considering the strength of the evidence against [the appellant] and the trial court's thorough and correct instructions to the jury, it is unlikely that defense counsel's failure to object to the prosecutor's [incorrect]

---

[9] We need not and do not decide whether an involuntary manslaughter charge was properly given based on the trial evidence.

14

statements about reasonable doubt affected the outcome of [the appellant's] trial."); *Clark v. State*, 307 Ga. 537, 544 (837 SE2d 265) (2019) (holding that the appellant failed to show prejudice based on trial counsel's failure to object to the prosecutor's plain misstatement of the law on the presumption of innocence, because the trial court correctly instructed the jury on the relevant law and the appellant had not presented any evidence that the jury ignored those instructions).

*Judgment affirmed. All the Justices concur.*

Decided September 21, 2021.

Murder. Fulton Superior Court. Before Judge McBurney.

*Axiom Global, Erica C. Matos*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Richard B. Caplan, Burke O. Doherty, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hobbs, Assistant Attorney General,* for appellee.