**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0083
George Richardson
v.
The State

On Appeal from the Superior Court of Crisp County
No. 17R481

Decided: May 19, 2026

LAND, Justice.

Appellant George Richardson challenges his 2021 convictions for malice murder and other crimes in connection with the shooting death of Carnell Saintville.[1] Richardson argues that the

---

[1] Saintville was killed on or about September 5, 2015. On November 6, 2017, a Crisp County grand jury indicted Richardson, along with co-defendants Arianna Hughes and Zankee Newsome, for malice murder (Count 1), felony murder (Count 2), aggravated assault as to Saintville (Count 3), and aggravated assault as to Montavious McCloud (Count 4). On July 29, 2021, the State filed a notice of evidence to be used in aggravation of sentence pursuant to OCGA § 17-10-7. At a trial in August 2021, the jury found Richardson guilty of all charges. The trial court sentenced Richardson to serve life in prison without the possibility of parole for Count 1 and a term of 20 years in prison without the possibility of parole for Count 4, to run consecutively to Count 1. Count 2 was vacated by operation of law and Count 3 merged with Count 1 for sentencing purposes. On November 1, 2021, Richardson filed a motion for new trial, which was amended by new counsel on April 19, 2024, July 5, 2024, and October 7, 2024. The trial court held an evidentiary hearing on March 11, 2025, and a fourth amended motion for new trial was filed on April 21, 2025. The trial court entered a written order denying Richardson's motion for new trial on July

evidence was legally insufficient to support his convictions, that the trial court erred in denying his motion for new trial on the general grounds and in denying his motion for directed verdict at trial, and that he was denied the effective assistance of counsel. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows as follows. In 2015, Montavious McCloud was working as a supervisor at a check verification company in Cordele. At some point in 2015, McCloud, Carnell Saintville, and Zankee Newsome began planning to engage in a check cashing scheme. Newsome introduced McCloud and Saintville to three people he knew as "Dre, George [Richardson], and Red." According to Newsome, Richardson "didn't have a part with the check cashing scheme" and the "only thing he did was drive."

On August 26, 2015, Newsome's Facebook account messaged McCloud's Facebook account with photos of checks that he and a group of people were going to try to cash in Tampa, Florida later that day. Although the group was able to cash one of the fake checks, McCloud was unable to "approve" the second check.

On September 4, Saintville, McCloud, and Newsome's girlfriend, Arianna Hughes, drove to Florida to pick up Newsome. The group then met up with Dre and Richardson in a store parking lot. Dre became upset with Saintville and McCloud and told them that they owed him money, and Newsome gave Dre $400 to calm things down. Saintville, McCloud, Newsome, and Hughes then drove back from Florida to Cordele.

---

14, 2025. On August 4, 2025, Richardson filed a notice of appeal. The case was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

The next day, on September 5, Richardson rented a white Dodge Charger in Tampa and drove Dre, Red, and a man named Tommy to Cordele. All of the men were armed. That evening, Dre called Newsome, and Newsome met up with Dre and the other men at a gas station parking lot. Richardson later drove the group to a house where Hughes was babysitting.

Dre told Newsome that he wanted to talk with Hughes, so Newsome texted Hughes to come outside. After being told to leave, Richardson drove Dre, Red, and Tommy away but returned about twenty minutes later. Meanwhile, Newsome's cousin and another unidentified man arrived at the house. When Hughes came outside, she saw the white Charger driven by Richardson, Newsome, Newsome's cousin, two men in masks, and Dre. Hughes overheard Dre tell Newsome that the men would "have a gun at [her]," but did not plan to shoot her. Hughes was forced into the Charger's front passenger seat. Newsome's cousin also got into the backseat of the Charger. Richardson drove Hughes away while the two armed men held her at gun point. Dre and Newsome stayed at the house. Eventually, the armed men told Hughes to get out of the car and walk slowly in front of them. Hughes was instructed to call and text Saintville and ask him to pick her up; Hughes did so. The two armed men held Hughes at gunpoint in bushes nearby while Richardson parked the Charger in a nearby alley.

Meanwhile, Saintville and McCloud were at a restaurant with a friend when Saintville began to receive Hughes's calls and messages. Saintville dropped off his friend at her home and drove with McCloud to meet Hughes. As Saintville's car approached Hughes, the armed men told Hughes to walk up to his car slowly. When Hughes tried to open the rear driver's side door, the men began shooting. Saintville attempted to drive away but was shot

in the back. McCloud reached over and stopped the car, pulled Saintville into the backseat, and drove to the hospital. Saintville died from his wounds, and the medical examiner who conducted his autopsy testified that the cause of death was a single gunshot wound to his torso.

After the shooting started, Hughes tried to run away. However, Richardson drove up next to her and the armed men instructed her to get back into the car. As Richardson drove Hughes away from the scene, the men told her that if she said anything she would be killed. Richardson dropped Hughes off in another neighborhood and drove Newsome's cousin and the armed men back to Dre's location. Newsome's cousin exited the car, and Dre, who was holding Newsome at gunpoint, forced Newsome into the car; Richardson drove the group back to Tampa. Newsome testified that everyone in the car was armed, including Richardson, and that as Richardson drove, the men discussed Saintville's shooting. One of the men stated that when they got to Tampa, they would "have to kill" Newsome because he "knew too much." Newsome testified that he was able to escape when the group stopped at a motel and that he turned himself into police.

2. Richardson argues that the evidence was constitutionally insufficient to support his convictions. Specifically, Richardson argues that his convictions rely solely on uncorroborated accomplice testimony and that he was merely present for the crimes. We disagree.

In evaluating the sufficiency of the evidence as a matter of constitutional due process, we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 US 307, 319 (1979); *Perkins*

4

*v. State*, 313 Ga. 885, 891 (2022). "We leave to the jury 'the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts.'" *Perkins*, 313 Ga. at 891 (citation omitted).

"It is well established that a person who does not directly commit a crime may be convicted upon proof that the crime was committed and that person was a party to it.'" *Clark v. State*, 315 Ga. 423, 427 (2023) (cleaned up). See also *Crawford v. State*, 312 Ga. 452, 455–56 (2021) ("Even where it is undisputed that the victim was shot by another person, every person concerned in the commission of the crime may be convicted of the crime." (citation and punctuation omitted)); *White v. State*, 298 Ga. 416, 418 (2016) ("The fact that [the defendant] was merely the driver and did not actually fire the gun does not undermine the legal sufficiency of the evidence against him."). "Conviction as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Clark*, 315 Ga. at 427. "However, mere presence at the crime scene is insufficient to make someone a party to a crime." Id. at 427–28.

Although the evidence presented at trial indicated that Richardson did not personally shoot at Saintville or McCloud, there was ample evidence of Richardson's conduct before, during, and after the crimes to support his convictions for aggravated assault as to McCloud and malice murder as to Saintville. Richardson drove Dre to confront Saintville about owing him money. He then rented a car to drive Dre and other armed men to Cordele; drove the car as the group tracked down Newsome and Hughes; drove the car as the group forced Hughes in at gunpoint and picked a location to ambush Saintville. Richardson then parked

5

the car and waited until the ambush was complete before driving away from the scene of the shooting as the group forced Hughes and then Newsome into the car. Richardson also stayed with the group as they discussed the murder and after they reached Tampa, even after Newsome escaped. This evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Richardson was a party to the crimes of which he was convicted. See *White*, 298 Ga. at 418 (evidence sufficient to convict appellant as party to the crime where evidence showed that appellant drove his two passengers "slowly past the crime scene, circled back, returned to the scene a second time, stopped before the shooting, rapidly drove [the passengers] away from the scene after the shooting, dropped them off before going to work, and lied about his presence when questioned by police").

As for Richardson's argument that the accomplice testimony against him by other members of the check-cashing scheme was uncorroborated, "OCGA § 24-14-8 provides that corroboration is required to support a guilty verdict in felony cases where the only witness is an accomplice." *Clements v. State*, 317 Ga. 772, 789 (2023) (citation and punctuation omitted).[2] However, "[w]hether accomplice testimony has been sufficiently corroborated is a question for the jury, and even slight corroborating evidence of a defendant's participation in a crime is sufficient." Id. at 790 (citation and punctuation omitted). Here, two of Richardson's co-indictees, Hughes and Newsome, testified at trial and sufficiently corroborated one another's testimony about Richard-

---

[2] We assume without deciding for purposes of our analysis that the accomplice-corroboration requirement is properly part of the federal constitutional sufficiency analysis. Compare *Johnson v. State*, 311 Ga. 221, 223 n.2 (2021) with *Baker v. State*, 320 Ga. 156, 165 n.3 (2024).

6

son's involvement in the crimes. See id. at 790 (holding that requirement under OCGA § 24-14-8 was satisfied where two accomplices testified at trial about appellant's involvement in the crimes and "sufficiently corroborated one another's testimony"). Both Hughes and Newsome testified that Richardson was driving the white Charger before and after Saintville's murder. Accordingly, the evidence presented at trial satisfied the statutory requirement under OCGA § 24-14-8 and was sufficient for the jury, which was instructed on accomplice corroboration, to conclude beyond a reasonable doubt that Richardson was a party to the crimes of malice murder of Saintville and aggravated assault of McCloud. [3]

3. Richardson argues that the trial court abused its discretion in denying his motion for new trial on the general grounds. This enumeration is without merit.

Sitting as the thirteenth juror "requires the judge to consider matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence." *Ridley v. State*, 315 Ga. 452, 456 (2023). "[T]he merits of the trial court's decision on the general grounds are not subject to our review," id., and the decision to grant a new trial on the general grounds "is vested solely in the trial court." *Ward v. State*, 316 Ga. 295, 299 (2023) (citation and punctuation omitted).

In its order denying Richardson's motion for new trial, the trial court stated the following:

Based on a thorough review of the trial transcripts,

---

[3] To the extent Richardson also argues that the evidence was insufficient under OCGA § 24-14-6, that statute does not apply where, as here, the State presented direct evidence of Richardson's guilt as a party to the crimes. See *Montgomery v. State*, 323 Ga. 188, 191 (2025).

as well as this Court's recollection of the testimony and evidence presented at trial, this Court finds that any rational trier of fact could have found the essential elements of the crimes for which the Defendant was convicted beyond a reasonable doubt as a party to the crime. *Jackson v. Virginia*, 443 US 307, 318–19 (1979). The verdicts were not contrary to the evidence nor without evidence to support them. Id. Further, the verdicts were not decidedly nor strongly against the weight of the evidence, the law, nor the principles of justice and equity.

This Court finds that the State proved the Defendant's guilt beyond a reasonable doubt, and this Court, in exercising its discretion as a "13th juror," finds that the evidence was not sufficiently close to warrant a new trial. Both OCGA §§ 5-5-20 and 5-5-21 afford the trial court broad discretion to sit as a thirteenth juror. When reviewing a motion for new trial, the trial court has the duty to exercise its discretion, weigh the evidence, and consider the credibility of the witnesses. *Choisnet v. State*, 292 Ga. 860, 861 (2013). In exercising its discretion, the trial judge must consider some of the things that he cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence, meaning that the trial judge may grant a new trial on the general grounds even when the evidence is legally sufficient to sustain a conviction. *State v. Denson*, 306 Ga. 795, 798–99 (2019). However, this discretion is not boundless; it should be exercised

8

with caution and invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. Id. This Court has taken seriously its substantial discretion, and weighing the particular facts and overall circumstances of this case, declines to grant a new trial.

Thus, although Richardson argues that the trial court's order "simply denies relief and thus failed to meaningfully act as the thirteenth juror," the order reflects that the trial court exercised its discretion as the thirteenth juror. See *King v. State*, 316 Ga. 611, 616 (2023) (trial court properly exercised its discretion as the thirteenth juror when "[i]n its order denying [the defendant]'s motion for new trial, the court expressly rejected [the defendant]'s general grounds claim because it found that 'the weight of the evidence does not preponderate heavily against the verdict and the verdict was not contrary to the evidence or the principles of justice and equity'").

4. Richardson argues that the trial court erred in denying his motion for directed verdict. But because "[t]he standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction," this claim fails for the same reasons that Richardson's sufficiency claim fails, as discussed in Division 2. See *Smith v. State*, 304 Ga. 752, 754 (2018).

5. Richardson argues that he received ineffective assistance of counsel in multiple ways. These claims fail.

To establish a claim of ineffective assistance of counsel, a defendant must prove both deficient performance by his counsel and resulting prejudice. See *Strickland v. Washington*, 466 US 668, 687 (1984). To prove deficient performance, a defendant must

9

show that his attorney performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687–88. The law recognizes a "strong presumption" that counsel performed reasonably, which the defen-dant bears the burden of overcoming. Id. at 689. And "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Wells v. State*, 295 Ga. 161, 164 (2014) (citation omitted).

Even when a defendant has proved that his counsel's performance was constitutionally deficient, the defendant also must prove resulting prejudice to prevail on a claim of ineffective assistance of counsel. To do so, the defendant must establish that but for his counsel's unprofessional errors, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Strickland*, 466 US at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 US 86, 104 (2011) (quoting *Strickland*, 466 US at 693). Rather, the defendant must demonstrate a "reasonable probability" of a different result, which is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. "If either *Strickland* prong is not met, this Court need not examine the other prong." *Palmer v. State*, 303 Ga. 810, 816 (2018). In all, the burden of proving a claim of ineffective assistance of counsel is a heavy one. See *Harrington*, 562 US at 105.

(a) Richardson argues that his trial counsel rendered ineffective assistance when he failed to meaningfully challenge a potentially biased juror, M.C., or conduct adequate follow-up questioning of that juror.

During voir dire, the trial court asked jurors questions listed in OCGA § 15-12-164(a)[4], and Juror M.C. did not indicate that he had any bias for or against Richardson. In response to other questions during voir dire, M.C. stated that he was retired and had previously served on both a grand jury as well as a previous jury trial. M.C. revealed that his son had been murdered in Atlanta several years prior to trial, but when asked whether his son's murder would impact his ability to be fair and impartial, M.C. stated "no." Trial counsel did not ask any additional follow-up questions and M.C. served on the jury.

At the hearing on Richardson's motion for new trial, trial counsel testified that he believed M.C. could be fair and impartial

---

[4] OCGA § 15-12-164(a) provides the following:

On voir dire examination in a felony trial, the jurors shall be asked the following questions:

(1) "Have you, for any reason, formed and expressed any opinion in regard to the guilt or innocence of the accused?" If the juror answers in the negative, the question in paragraph (2) of this subsection shall be propounded to him;

(2) "Have you any prejudice or bias resting on your mind either for or against the accused?" If the juror answers in the negative, the question in paragraph (3) of this subsection shall be propounded to him;

(3) "Is your mind perfectly impartial between the state and the accused?" If the juror answers this question in the affirmative, he shall be adjudged and held to be a competent juror in all cases where the authorized penalty for the offense does not involve the life of the accused; but when it does involve the life of the accused, the question in paragraph (4) of this subsection shall also be put to him;

(4) "Are you conscientiously opposed to capital punishment?" If the juror answers this question in the negative, he shall be held to be a competent juror.

11

and noted that he would have discussed whether to strike M.C. with Richardson before making a final decision.

Trial counsel's strategic decision not to ask further follow-up questions after M.C. stated that he would be fair and impartial because he was satisfied with that answer was objectively reasonable and therefore Richardson has not shown that trial counsel's performance was deficient. See *Bright v. State*, 292 Ga. 273, 275 (2013) (trial counsel's questioning during voir dire was professionally reasonable); see also *Cade v. State*, 289 Ga. 805, 808–09 (2011) (concluding trial counsel made reasonable strategic decisions in declining to pursue further questioning of two jurors).

(b) Richardson argues that his trial counsel rendered ineffective assistance when he failed to review and share video discovery with him or "use exculpatory/alternative-suspect material."

Trial counsel testified at the motion for new trial hearing that his defense strategy was to highlight that the State had been unable to arrest any of the "actual shooter[s]" in this case and was "focusing on Mr. Richardson, who was not the guilty party" and was "just the driver" and a "scapegoat." Trial counsel also testified that he met with Richardson multiple times, reviewed discovery with him, and that "anything [he] received, [he] would have turned over discovery to Mr. Richardson." With respect to one of the videos "where officers said they had contact with Mr. Richardson," trial counsel testified that although he "didn't watch the video" with Richardson, he "gave the summaries, as well as the transcription best we could get it out" because the "audio was not the greatest."

As an initial matter, Richardson fails to identify the video that he alleges his trial counsel did not show him beyond stating

12

that it showed "officers said they had contact with Mr. Richardson," or the other discovery materials that allegedly pointed to alternative suspects. He has therefore not carried his burden of showing that his trial counsel performed deficiently. See, e.g., *Wallace v. State*, 296 Ga. 388, 392 (2015) (holding that the appellant had not shown that his trial counsel performed deficiently by failing to file a motion to suppress identification evidence, because he did not specify which witnesses gave objectionable testimony or why it was inadmissible and explaining that "it is not this Court's job to cull the record on behalf of the [appellant] to find alleged errors") (citation omitted). See also *Westmoreland v. State*, 287 Ga. 688, 696 (2010) ("[T]he burden is always on the appellant in asserting error to show it affirmatively by the record.") (citation and punctuation omitted).

Moreover, "[t]here is no per se rule requiring counsel for criminal defendants to provide them with copies of all discovery materials." *Lee v. State*, 318 Ga. 412, 430 (2024) (citation and punctuation omitted), and Richardson has not explained how trial counsel's decision to provide a transcript for a video with poor audio quality was objectively unreasonable or how he was prejudiced by that decision. Richardson has also failed to support his claim that trial counsel did not use "exculpatory/alternative suspect material." See *Gittens v. State*, 307 Ga. 841, 844 (2020) ("Unfounded speculation about what additional investigation might have uncovered or about what unnamed witnesses may have testified [to] cannot support a claim that trial counsel was professionally deficient, nor can it establish prejudice."). Accordingly, this claim fails.

(c) Richardson argues that his trial counsel rendered ineffective assistance when he failed to object to GBI Agent Robert Cunningham's "prejudicial and unsupported" testimony "t[ying]

13

other named individuals to the crime." This claim fails.

Richardson does not explain how Agent Cunningham's testimony, which upon our review of the record was limited to establishing the chain of custody for items taken from the GBI regional office to the crime lab, "tied other named individuals to the crime," nor does he identify the other named individuals. To the extent Richardson meant to refer to GBI Agent Terry Howard, who testified that he met with two possible suspects, Andre "Dre" Smith and Antonio Vulmer[5], during his investigation of the crimes, "[t]he matter of when and how to raise objections is generally a matter of trial strategy." *Hayes v. State*, 298 Ga. 98, 105 (2015) (citation and punctuation omitted). Here, trial counsel testified that, as part of a defense strategy, he did not object to this testimony because he wanted to highlight that the State had been unable to arrest the individuals who actually shot at Saintville and McCloud and was instead using Richardson, who was merely present as a driver, as a scapegoat. This decision to use Agent Howard's testimony to support Richardson's defense theory was objectively reasonable, and Richardson has therefore not shown deficient performance. See *Sawyer v. State*, 308 Ga. 375, 386 (2020) (failing to object to testimony was reasonable trial strategy where the statement was used to support defendant's overall defense strategy).

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

---

[5] Vulmer was another individual involved in the check-cashing scheme.