315 Ga. 423
FINAL COPY

S22A0950.  CLARK v. THE STATE.

WARREN, Justice.

William Clark was convicted of felony murder and other crimes in connection with the shooting death of Anthony King and the aggravated assault of Anthony Davis.[1]  In this appeal, Clark

---

[1] The crimes occurred on August 3, 2012.  In October 2012, a Richmond County grand jury indicted Clark and Jeremiah Kelly for malice murder, felony murder (based on the aggravated assault of King), two counts of aggravated assault (one against Davis and the other against his brother, Travis Davis), and three counts of possession of a firearm during the commission of a crime (based on the murder of King, the aggravated assault of Davis, and the aggravated assault of Travis).  Clark alone was tried from October 11 to 14, 2016; the jury found him not guilty of malice murder and the aggravated assault and firearm offense against Travis, but guilty of the remaining crimes.  The trial court sentenced him to serve life in prison without the possibility of parole for felony murder, 20 consecutive years for the aggravated assault against Davis, and five consecutive years each for the two counts of possession of a firearm during the commission of a crime.  Kelly, who was tried in March 2015, was found not guilty of malice murder but guilty of the remaining counts against him; we address his appeal today in a separate opinion.  See *Kelly v. State*, 315 Ga. 444 (___ SE2d ___) (2023).  Clark filed a timely motion for new trial, which he amended twice through new counsel.  After hearings in November 2021 and February 2022, the trial court denied the motion in March 2022 but modified Clark's sentence for felony murder to life with the possibility of parole.  Clark then filed a timely notice of appeal, and his case was docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

contends that the evidence presented at his trial was legally insufficient to support his convictions for the crimes against King; the trial court applied the wrong standard in admitting evidence of an audio recording of his interview with the lead investigator for his case; the trial court committed plain error by failing to instruct the jury on knowledge, grave suspicion, mere presence, and mere association; and his trial counsel provided constitutionally ineffective assistance by failing to request those instructions and by failing to file a demurrer to the indictment. Each of these claims is meritless, so we affirm.

1. The evidence presented at Clark's trial showed the following.[2] On the evening of August 3, 2012, King, Davis, and Davis's brother, Travis Davis ("Travis"), hung out and drank alcohol. Around 11:00 p.m., Travis drove them to a convenience store in Augusta to buy beer. Travis stayed in his SUV while King and Davis

---

[2] "Because this case requires an assessment of the harmful or prejudicial effect of certain alleged trial court errors and deficiencies of trial counsel, we lay out the evidence in detail and not only in the light most favorable to the verdicts." *Rawls v. State*, 310 Ga. 209, 210 n.2 (850 SE2d 90) (2020).

walked toward the store.

According to Davis, he and King recognized two young men, whom he identified at trial as Clark and Jeremiah Kelly, outside the store.[3] Davis told King that he believed that Clark and Kelly had fired shots at him about two weeks earlier. King stopped to talk to them while Davis went inside the store. A surveillance video recording from the convenience store showed King, Clark, and Kelly calmly talking in front of the store at 11:00 p.m. A few minutes later, King went inside the store and Clark and Kelly walked out of view of the cameras. Davis testified that King then said something like "them little f\*\*kers outside." King and Davis purchased some beer and left the store.

Travis dropped off King and Davis on a nearby street so they could walk to a friend's house. Davis testified as follows. As he and King walked through a parking lot, they saw Clark and Kelly again. King said something to them; the four men started arguing; and Clark and Kelly pulled out guns. King and Davis were not carrying

---

[3] Clark was then 16 years old, and Kelly was 15 years old.

3

guns. An Oldsmobile pulled up, and two men, who were later identified as Curtis Washington and Treyvon Archie, told Clark and Kelly to put their guns away. Moments later, Travis pulled up in his SUV and tried to "defuse the situation." Clark then fired his gun into the air; Kelly started shooting; and Clark shot toward Davis. King got in the SUV and began to drive away as Davis and Travis ran, and Kelly told Clark to "chase after them." Davis fled to a nearby restaurant, where he called 911.

Travis recounted a similar story. According to Travis, moments after he dropped off King and Davis, he had "a bad feeling," so he drove back toward them. Two men, whom he identified at trial as Clark and Kelly, were pointing guns at King and Davis. Travis was not carrying a gun. An Oldsmobile was parked in the middle of the street, but the men in it did not appear to be involved in the argument. Travis got out of his SUV and told Clark and Kelly to put their guns down. Clark then fired his gun, and Kelly started shooting. Davis ran away, and Kelly told Clark, "we've got one trying to get away, get him." Clark chased Davis, firing two more

shots, as Kelly walked toward the SUV and said "uh-huh, pow."

Travis ran, but soon saw King driving the SUV and jumped in the

passenger seat. Travis then saw that King had been shot. The SUV

crashed into a tree, and Travis got out and ran away.[4]

Investigators who responded to the scene found King, who had

been shot once in the chest, in the driver's seat of the SUV. He was

transported to a hospital, where he later died. A medical examiner

recovered a bullet fragment from King's chest, and investigators

found three .380 shell casings at the scene. A firearms examiner

later concluded that all of the shell casings had been fired from the

same .380 pistol and that the bullet fragment was fired from a .380

pistol. Investigators did not find any guns at the scene.

Investigators identified Clark and Kelly as suspects, and Clark

---

[4] A surveillance video recording from the parking lot where the shooting occurred, the quality of which the prosecutor described as "poor," was admitted into evidence. Davis and the lead investigator for the case testified that the video showed the following. King and Davis walked through the parking lot around 11:20 p.m.; an Oldsmobile pulled up, followed by an SUV; Davis and Travis ran away as a man, whom Davis identified at trial as Clark, chased them; and Travis got in the passenger side of the SUV, which drove through the parking lot and out of view.

and Kelly turned themselves in the day after the shooting. The lead investigator interviewed Clark that evening; the interview was audio-recorded and later played for the jury. Initially, Clark denied being present during the shooting, but he eventually told the following story. He and Kelly were outside the convenience store when two men approached and asked if they had been involved in a prior shooting. When they denied any involvement, the men left, but Clark and Kelly soon encountered them again in a nearby parking lot. The men "kept walking up on them" and again asked if they had been involved in the shooting. Clark said "no." Clark's friend Washington then pulled up in an Oldsmobile and asked what was happening. Clark responded that he did not know. An SUV then drove up, and "a big dude jumped out." Kelly fired his gun as Clark fled.[5]

---

[5] Washington and Archie did not testify. The lead investigator testified that Washington said during an interview that he did not see Clark with a gun that night and that Kelly shot at King, Davis, and Travis. The investigator also testified that Archie said during an interview that both Clark and Kelly had guns that night. Clark did not object to this testimony at trial, and he does not contend in this appeal that the testimony was improperly admitted.

The lead investigator testified that his investigation indicated that Kelly fired the shot that killed King, and it appears that the State's theory of the case was that Kelly was the shooter and Clark was a party to the crimes. Clark did not testify, and the trial's opening statements and closing arguments were not transcribed.

2. Clark contends that the evidence presented at his trial was insufficient as a matter of constitutional due process to support his convictions for felony murder (based on aggravated assault against King) and possession of a firearm during the commission of that crime.[6] Specifically, Clark argues that the State failed to prove that he participated in killing King because the evidence showed that Kelly was the shooter. We reject that argument.[7]

---

[6] Clark does not challenge the sufficiency of the evidence supporting his convictions for aggravated assault against Davis or possession of a firearm during the commission of that crime, and this Court no longer routinely reviews evidentiary sufficiency sua sponte, except with respect to murder convictions resulting in the death penalty. See *Davenport v. State*, 309 Ga. 385, 398-399 (846 SE2d 83) (2020).

[7] In arguing about the sufficiency of the evidence, Clark asserts that the State was required to charge him with aggravated assault against King because his felony-murder conviction was based on that crime. That claim, however, relates to the sufficiency of the substance of the indictment—not the sufficiency of the evidence presented at trial. Because Clark did not challenge

7

In evaluating the sufficiency of the evidence as a matter of constitutional due process, we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Perkins v. State*, 313 Ga. 885, 891 (873 SE2d 185) (2022). "We leave to the jury 'the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts.'" *Perkins*, 313 Ga. at 891 (citation omitted).

To support Clark's conviction for felony murder, the evidence presented at trial had to show that he proximately caused King's

the substance of the indictment in the trial court, he has forfeited this claim. See *Hinkson v. State*, 310 Ga. 388, 397 (850 SE2d 41) (2020) (explaining that "'a general demurrer may be raised after jeopardy has attached and at any time during trial,' as well as 'in the form of a motion in arrest of judgment after a verdict in the same term of court'") (citation omitted). Clark also raises this issue in the context of a claim that his trial counsel provided constitutionally ineffective assistance by failing to file a demurrer to the indictment (an argument he also made in his amended and second amended motions for new trial). We address that claim in Division 5 (b).

8

death, either directly or as a party to the crime, while in the commission of an aggravated assault with a deadly weapon. See OCGA § 16-5-1 (c). See also *Mathews v. State*, 314 Ga. 360, 365 (877 SE2d 188) (2022) ("'[F]elony murder requires only that the defendant possessed the requisite criminal intent to commit the underlying felony—in this case, aggravated assault, which also does not require intent to kill.'") (citation omitted). The trial court instructed the jury on aggravated assault, which OCGA § 16-5-21 (a) (2) defines, in pertinent part, as an "assault[ ] . . . [w]ith a deadly weapon." The court also instructed on parties to a crime under OCGA § 16-2-20. That statute says, among other things, that "[e]very person concerned in the commission of a crime[,]" including one who "[i]ntentionally aids or abets in the commission of the crime" or "[i]ntentionally advises [or] encourages . . . another to commit the crime" is "a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a), (b) (3)-(4).

It is well established that "'[a] person who does not directly

9

commit a crime may be convicted upon proof that the crime was committed and that person was a party to it.'" *Glenn v. State*, 306 Ga. 550, 553 (832 SE2d 433) (2019) (citation omitted). See also *Crawford v. State*, 312 Ga. 452, 455-456 (863 SE2d 75) (2021) ("'Even where it is undisputed that the victim was shot by another person, every person concerned in the commission of the crime may be convicted of the crime.'") (citation omitted). Conviction as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes. See, e.g., *Glenn*, 306 Ga. at 553. However, mere presence at the crime scene is insufficient to make someone a party to a crime. See, e.g., id.

Although the evidence presented at trial indicated, and the parties did not dispute, that Clark did not personally fire the shot that killed King, there was ample evidence from which the jury reasonably could infer that Clark and Kelly shared a common criminal intent with respect to the shooting. When properly viewed

in the light most favorable to the verdicts, the evidence showed that Clark and Kelly encountered King and Davis outside the convenience store shortly before the shooting—a fact supported by surveillance video. A few minutes later, when Clark and Kelly saw King and Davis again, the men argued. Clark and Kelly each pulled out a gun; Clark fired first; and Kelly then began shooting. Kelly approached the SUV, and at some point, King was shot and killed. In addition, Kelly told Clark to chase Davis, and Clark followed that instruction, firing more shots as he ran after him. Clark then lied during his interview with the lead investigator, claiming that he had not been present during the shooting.

Thus, even if Clark did not himself shoot King, the evidence presented at trial was still sufficient as a matter of constitutional due process to authorize a rational jury to find him guilty beyond a reasonable doubt as a party to the crimes of felony murder based on aggravated assault and possession of a firearm during that offense. See, e.g., *Mathews*, 314 Ga. at 365 (holding that the jury was authorized to conclude that the appellant was guilty of felony

11

murder based on aggravated assault, even though the evidence presented at trial did not establish whether he or his co-defendant shot the murder victim, because they shared a common criminal intent); *Williams v. State*, 307 Ga. 689, 691 (838 SE2d 314) (2020) (holding that the evidence presented at trial was legally sufficient to prove that the appellant, who did not shoot the victim, was guilty as a party to the murder, partly because he and some of the other assailants were in a car together, argued with the victim, and pulled out guns just before the shooting).[8]

3. Clark contends that the trial court applied the "wrong standard" in admitting into evidence the audio recording of his interview with the lead investigator. He argues that because he was a juvenile at the time of his interview, see OCGA § 15-11-2 (10) (B) (defining "[c]hild"), the trial court was required to consider each of

---

[8] To the extent Clark also challenges his felony-murder and firearm convictions under OCGA § 24-14-6, even if we assume that the evidence presented at trial was entirely circumstantial, it was nonetheless sufficient to exclude every reasonable hypothesis other than that of his guilt. See id. ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.").

the nine factors set forth in *Riley v. State*, 237 Ga. 124 (226 SE2d 922) (1976), to determine whether he knowingly and voluntarily waived his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

As we will explain more below, we take this opportunity to clarify that *Riley* held that trial courts are to use a totality-of-the-circumstances test to determine whether a juvenile knowingly and voluntarily waived his constitutional rights, and we reaffirm that holding today.[9] However, requiring courts to apply the specific nine-factor framework *Riley* set forth for assessing the totality of the circumstances is in tension with the totality-of-the-circumstances test itself, and we therefore disapprove language in *Riley* and later cases suggesting that the nine-factor framework is required or exclusive.[10] Finally, because the record in this case does not indicate

---

[9] We note that we have also applied *Riley*'s totality-of-the-circumstances test in evaluating whether a juvenile's statement to law enforcement officials was voluntarily made as a matter of due process. See, e.g., *State v. Powell*, 315 Ga. 5, 12 (880 SE2d 189) (2022); *Lester v. State*, 310 Ga. 81, 85 n.7 (849 SE2d 425) (2020). Clark does not claim a due-process violation here.

[10] Our concern about *Riley* is not new: several of us recently have

that the trial court failed to apply a totality-of-the-circumstances test, Clark's claim fails.

(a)  We begin with a discussion of *Riley* and other cases from the United States Supreme Court and this Court that have established the legal standard that a trial court must apply in determining whether a juvenile knowingly and voluntarily waived his rights under *Miranda*.

It appears that *Riley* was one of the earliest cases in which this Court considered a waiver of rights by a juvenile.[11]  Riley argued

expressed concerns about *Riley*'s nine-factor framework.  See *Powell*, 315 Ga. at 12 n.5 (noting that "[a] number of us have recently expressed concerns about the prescriptive and restrictive nature of *Riley*'s nine-factor analysis for juveniles"); *State v. Burton*, 314 Ga. 637, 650 (878 SE2d 515) (2022) (Pinson, J., concurring, joined by Boggs, C. J., and Warren, Bethel, and McMillian, JJ.) (expressing doubts about the "juvenile-specific," nine-factor analysis in *Riley*); *Daniels v. State*, 313 Ga. 400, 418 (870 SE2d 409) (2022) (Nahmias, C. J., concurring specially in part, joined by Boggs, P. J., and Warren, J.) (expressing "doubts about how a trial court is to make, and an appellate court is to review, a ruling based on a *nine*-factor, totality-of-the-circumstances test") (emphasis in original).

[11] Three years before *Riley* was decided, this Court summarily held in *Williams v. State*, 231 Ga. 508 (202 SE2d 433) (1973), that the trial court did not err by admitting into evidence a juvenile's statement to the police, noting that the statement was made in the presence of his mother and after he was advised of his rights under *Miranda*.  See id. at 509.  In addition, a few months before the decision in *Riley*, we similarly held (with little discussion) in

14

that he did not knowingly and voluntarily waive his rights under *Miranda* because he was a juvenile and his parents were not present when he was interviewed by the police. See *Riley*, 237 Ga. at 127. This Court declined to determine that such a waiver was involuntary per se, holding instead that "the question of a voluntary and knowing waiver depends on the totality of the circumstances[,] and the state has a heavy burden in showing that the juvenile did understand and waive his rights." Id. at 128. Relying on a decision of the United States Court of Appeals for the Fifth Circuit that similarly declined to apply a per se rule excluding evidence of a juvenile's incriminating statements to the police, the *Riley* Court went on to say that

> age alone is not determinative of whether a person can waive his rights. Instead, the question of waiver must be analyzed by a consideration of several factors. These are "(1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge . . . and the nature of his rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives,

*Crawford v. State*, 236 Ga. 491 (224 SE2d 365) (1976), that the trial court did not err by admitting evidence of a juvenile's confession, noting that he had been given *Miranda* warnings and that his statement was voluntary. See id. at 492.

15

friends or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogation; (7) length of interrogations; (8) whether vel non the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extra judicial statement at a later date."

Id. at 128 (quoting *West v. United States*, 399 F2d 467, 469 (5th Cir. 1968)).[12] The *Riley* Court then disapproved a Georgia Court of Appeals case, *Freeman v. Wilcox*, to the extent it could be read as requiring an automatic exclusion of a juvenile's statement to the police, and summarily concluded that Riley knowingly and voluntarily waived his rights, without expressly applying any of the nine factors it laid out before reaching its conclusion. See id. at 128 (disapproving *Freeman v. Wilcox*, 119 Ga. App. 325 (167 SE2d 163) (1969)).

Three years later, the United States Supreme Court in *Fare v.*

---

[12] In *West*, the Fifth Circuit rejected the appellant's contention that because he was a juvenile when he was interviewed by an investigator, he was "per se incapable of waiving" his rights under *Miranda*. 399 F2d at 468. Noting that "[f]actors considered by the courts in resolving this question include" the nine factors later listed in *Riley*, the court held that whether a juvenile knowingly and voluntarily waived his rights did not depend on "age alone," but rather on "the totality of circumstances." Id. at 469.

16

*Michael C.*, 442 U.S. 707 (99 SCt 2560, 61 LE2d 197) (1979),

examined whether a juvenile had invoked his rights pursuant to

*Miranda* by requesting to speak with his probation officer. See id.

at 710-716. Concluding that the juvenile's request was not a per se

invocation of his rights, the Court explained that

> the determination whether statements obtained during
> custodial interrogation are admissible against the
> accused is to be made upon an inquiry into the totality of
> the circumstances surrounding the interrogation, to
> ascertain whether the accused in fact knowingly and
> voluntarily decided to forgo his rights to remain silent and
> to have the assistance of counsel.

Id. at 724-725. "This totality-of-the-circumstances approach is

adequate to determine whether there has been a waiver even where

interrogation of juveniles is involved." Id. at 725. The Court further

explained,

> [w]e discern no persuasive reasons why any other
> approach is required where the question is whether a
> juvenile has waived his rights, as opposed to whether an
> adult has done so. The totality approach permits—
> indeed, it mandates—inquiry into all the circumstances
> surrounding the interrogation. This includes evaluation
> of the juvenile's age, experience, education, background,
> and intelligence, and into whether he has the capacity to
> understand the warnings given him, the nature of his
> Fifth Amendment rights, and the consequences of

17

waiving those rights.

Id. at 725.

Thus, our holding in *Riley*—that a totality-of-the-circumstances test is used to determine whether a juvenile knowingly and voluntarily waived his constitutional rights—is consistent with the totality-of-the-circumstances approach for juvenile waiver that was later established in *Fare*. And in the decades following *Riley* and *Fare*, this Court has repeatedly held that trial courts are to apply a totality-of-the-circumstances test in evaluating the admissibility of a juvenile's statement. See, e.g., *Williams v. State*, 238 Ga. 298, 302-303 (232 SE2d 535) (1977) (explaining that in *Riley*, "[w]e found that 'the question of a voluntary and knowing waiver depends on the totality of the circumstances'" and holding that "under the totality of the circumstances[,] . . . the trial court did not err in admitting [the juvenile defendant's] confession"); *Crawford v. State*, 240 Ga. 321, 323-324 (240 SE2d 824) (1977) (explaining that *Riley* "adopted a totality of the circumstances test" and holding that "[c]onsidering all

18

the circumstances," the State failed to prove "from the totality of the circumstances that the juvenile made a voluntary and knowing waiver" of her constitutional rights); *Massey v. State*, 243 Ga. 228, 228-229 (253 SE2d 196) (1979) ("In *Riley*, this court adopted a totality of the circumstance test to be used in considering whether a juvenile waived his right to remain silent."); *Smith v. State*, 263 Ga. 363, 364 (434 SE2d 465) (1993) (noting that *Riley* established a "totality of the circumstances test" and holding that the juvenile knowingly and voluntarily waived his rights under *Miranda*, "considering the totality of the circumstances"); *McKoon v. State*, 266 Ga. 149, 150 (465 SE2d 272) (1996) (citing *Riley* for the proposition that "[t]he admissibility of statements by juveniles depends upon whether, under the totality of the circumstances, there was a knowing and intelligent waiver of constitutional rights" and holding that the trial court "properly determined that under the totality of the circumstances, McKoon freely, knowingly, and voluntarily waived his *Miranda* rights"); *Berry v. State*, 267 Ga. 605, 610-611 (481 SE2d 203) (1997) (explaining that a juvenile's waiver

of rights is "considered under the totality of the circumstances" and holding that the "evidence in its entirety" and "in the context of the whole" supported the trial court's determination that the juvenile knowingly and intelligently waived his constitutional rights); *Nhek v. State*, 271 Ga. 245, 246 (517 SE2d 521) (1999) (citing *Riley* for the proposition that juvenile "waiver is assessed under the totality of the circumstances" and holding that "the [trial] court did not err in finding that, considering the totality of the circumstances, Nhek knowingly and voluntarily waived his rights"); *Brooks v. State*, 271 Ga. 875, 876 (525 SE2d 696) (2000) (explaining that *Riley* stood for the proposition that the "question of knowing and intelligent waiver by [a] juvenile depends on [the] totality of [the] circumstances" and upholding the trial court's determination that under the "totality of the circumstances," the juvenile defendant knowingly waived his rights under *Miranda*); *State v. Rodriguez*, 274 Ga. 728, 728-729 (559 SE2d 435) (2002) (explaining that whether a juvenile has made a knowing and intelligent waiver of his constitutional rights "depends on the totality of the circumstances," and concluding that

20

under the totality of the circumstances particular to that case, the State had not met its burden of demonstrating that the juvenile knowingly, intelligently, and voluntarily waived his constitutional rights); *Norris v. State*, 282 Ga. 430, 431 (651 SE2d 40) (2007) (citing *Riley* and *Fare* for the proposition that "[e]ven where, as here, a juvenile is involved, the question of whether there was a knowing and intelligent waiver of constitutional rights depends on the totality of the circumstances surrounding a police interrogation" and holding that "[c]onsidering the totality of the circumstances," the trial court did not err in concluding that the juvenile knowingly and voluntarily waived her rights); *Green v. State*, 282 Ga. 672, 673 (653 SE2d 23) (2007) (explaining that "[t]his court, in *Riley*, held that 'the question of a voluntary and knowing waiver [by a juvenile] depends on the totality of the circumstances'" and concluding that "[u]nder the totality of the circumstances, we agree with the trial court that there was a knowing and voluntary waiver of the right to remain silent"); *Allen v. State*, 283 Ga. 304, 305-306 (658 SE2d 580) (2008) (recognizing that *Riley* held that "[t]he admissibility of statements

21

by juveniles depends upon whether, under the totality of the circumstances, there was a knowing and intelligent waiver of constitutional rights" and holding that under all of the circumstances, the two juvenile defendants knowingly and voluntarily waived their constitutional rights); *State v. Lee*, 298 Ga. 388, 389 (782 SE2d 249) (2016) (citing *Fare* in explaining that a juvenile's waiver of his rights under *Miranda* depends on the totality of the circumstances and holding that "the trial court properly concluded based on the totality of the circumstances that Lee did not knowingly and intelligently waive his rights before giving his custodial statement"); *Love v. State*, 309 Ga. 833, 836 (848 SE2d 882) (2020) (explaining that a juvenile's waiver of rights depends on the totality of the circumstances and holding that "under the totality of the circumstances" the trial court did not err in determining that the juvenile knowingly and voluntarily waived his rights).

Because the totality-of-the-circumstances test set forth in *Riley* and its progeny is consistent with United States Supreme Court

precedent, we reaffirm that test today.[13]  But, as discussed more below, language in *Riley* and many of the cases that followed it also suggested that assessing the totality of the circumstances required applying a specific nine-factor framework.  Because requiring application of a fixed set of factors is inherently in tension with a totality-of-the-circumstances test, we disapprove any such language.

(b) As we mentioned above, after we correctly held in *Riley* that whether a juvenile knowingly and voluntarily waives his constitutional rights "depends on the totality of the circumstances[,]" the Court continued on by saying that "the question of waiver must be analyzed by a consideration of several

---

[13] Indeed, if *Riley*'s holding were inconsistent with the totality-of-the-circumstances test that *Fare* later established, we would be obligated to overrule *Riley*, because we must follow the United States Supreme Court's instructions on how to determine, as a matter of federal constitutional law, whether a juvenile has knowingly and voluntarily waived the rights protected by *Miranda.* See, e.g., *Ringold v. State*, 304 Ga. 875, 878 (823 SE2d 342) (2019) (explaining that "it is a fundamental principle that this Court is 'bound by the Constitution of the United States as its provisions are construed and applied by the Supreme Court of the United States'" and that "'[e]ven the venerable doctrine of stare decisis does not permit us to persist in an error of *federal* constitutional law'") (citations omitted; emphasis in original).

23

factors.  These are . . .” and listed nine specific factors.[14]  That language improperly suggested that in determining whether a juvenile knowingly and voluntarily waived his rights under *Miranda*, trial courts should examine the totality of the circumstances by mechanically applying those nine enumerated factors.  But proper application of a totality-of-the-circumstances test “mandates . . . inquiry into *all the circumstances* surrounding the interrogation.”  *Fare*, 442 U.S. at 725 (emphasis supplied).  See also, e.g., *United States v. Rivera*, 825 F3d 59, 63-64 (1st Cir. 2016) (explaining, in the context of determining whether there was sufficient probable cause to issue a search warrant under the Fourth Amendment, that “totality of the circumstances” “means that all material ‘circumstances should be considered’”) (citation omitted); *United States v. Melton,* 782 F3d 306, 311 (6th Cir. 2015) (noting, in the context of determining whether a criminal defendant’s

---

[14] We note that although *Riley*’s factors were derived from *West*, that case said that “[f]actors considered by the courts in resolving [the] question [of juvenile waiver] *include*” before listing the nine factors later enumerated in *Riley*.  See *West*, 399 F2d at 469 (emphasis supplied).  In other words, the nine factors listed in *West* were not exclusive.

admission during a revocation proceeding that he violated the conditions of his supervised release was knowing and voluntary, that "'the totality of the circumstances means exactly that—all the circumstances should be considered,'" and "'courts should beware of assigning talismanic significance to any single fact or circumstance'" as "'each case is quite likely to be sui generis'") (citation omitted). Indeed, any prescriptive or fixed list of factors by its very nature risks undermining a totality-of-the-circumstances test by suggesting that certain potentially relevant factors are not worthy of consideration, on one hand, and appearing to mandate consideration of other factors that may not be relevant in a particular case, on the other.

Thus, *Riley*'s list of nine specific factors, which this Court said "must be analyzed"[15] in applying a totality-of-the-circumstances test

---

[15] As we mentioned above, the *Riley* Court announced in dicta its list of nine factors after holding that "the question of a voluntary and knowing waiver depends on the totality of the circumstances," and the factors were not dispositive of the Court's conclusion that the trial court correctly determined that Riley knowingly and voluntarily waived his rights under *Miranda*. See *Riley*, 237 Ga. at 128.

to determine whether a juvenile knowingly and voluntarily waived his rights, is in tension with the totality-of-the-circumstances test itself—and thus with this Court's holding in *Riley*—because such a test requires that trial courts consider *all* of the relevant circumstances surrounding the juvenile's interview with law enforcement officials. See *Fare*, 442 U.S. at 725. And given that in a number of cases decided after *Riley*, this Court perpetuated the dicta in *Riley* that set forth the nine-factor framework of analysis as part of a totality-of-the-circumstances inquiry and used language incorrectly suggesting that trial courts are required to analyze each of those factors or are required to analyze those factors exclusively, we disapprove any language in those cases indicating that the nine-factor framework is required or exclusive.[16] Moreover, we make

---

[16] See, e.g., *Williams*, 238 Ga. at 302-303 (explaining that *Riley* held that whether a juvenile knowingly and voluntarily waived his constitutional rights depends on the totality of the circumstances (as noted above), but saying that "the totality of the circumstances is to be determined by consideration of the nine factors set out in *West*" and listing those factors); *Crawford*, 240 Ga. at 323-324 (explaining and applying a totality-of-the-circumstances test (as noted above), and stating that "[t]he court in *Riley* . . . set forth several of the factors to be considered among the totality of the circumstances" before listing the *Riley* factors); *Massey*, 243 Ga. at 228-229 (applying a totality-of-the-

26

circumstances test (as noted above), but briefly analyzing each of the *Riley* factors); *Lane v. State*, 247 Ga. 19, 20-21 (273 SE2d 397) (1981) (saying that a totality-of-the-circumstances test is used to determine juvenile waiver, but then stating that "[s]everal factors are considered by this court in applying the 'totality of the circumstances' test to the statement of a minor. They are . . ." and listing the *Riley* factors); *Marshall v. State*, 248 Ga. 227, 228-230 (282 SE2d 301) (1981) (noting that *Riley* held that "'the question of a voluntary and knowing waiver depends on the totality of the circumstances,' to be analyzed by a consideration of nine factors" and then listing and applying the *Riley* factors); *Howe v. State*, 250 Ga. 811, 812-813 (301 SE2d 280) (1983) (noting that "*Riley* . . . adopted a totality of the circumstances test," but listing and applying the nine *Riley* factors and concluding that "[b]ased upon the totality of the circumstances, as reflected in the nine-factor analysis," the trial court properly admitted the juvenile defendant's statement); *Couch v. State*, 253 Ga. 764, 765 (325 SE2d 366) (1985) (saying that "[t]he question of voluntary and knowing waiver of rights by a juvenile depends upon an analysis of nine factors," but then concluding that the trial court properly admitted the juvenile's statement "[c]onsidering all the circumstances"); *J. E. W. v. State*, 256 Ga. 464, 467 (349 SE2d 713) (1986) (saying that in *Riley*, we held that the question of waiver "depends on the totality of the circumstances to be analyzed by a consideration of nine factors" and then listing the *Riley* factors) (citation and punctuation omitted); *State v. McBride*, 261 Ga. 60, 63 (401 SE2d 484) (1991) (mentioning that the trial court applied a totality-of-the-circumstances test to determine whether the juvenile defendants waived their rights under *Miranda*, but saying that "[i]n determining this issue nine factors are to be considered" and listing the *Riley* factors); *Smith*, 263 Ga. at 364 (citing *Riley* for the proposition that "[w]hether a juvenile has made a knowing and voluntary waiver of his rights depends on the totality of the circumstances" (as noted above), but then saying "with consideration given to nine specific factors" and listing the *Riley* factors in a footnote); *Henry v. State*, 264 Ga. 861, 862 (452 SE2d 505) (1995) (holding that whether a juvenile defendant knowingly and voluntarily waived his rights depends on the "totality of the circumstances," but saying that a trial court "must consider" the nine *Riley* factors); *McKoon*, 266 Ga. at 150 (explaining and applying a totality-of-the-circumstances test (as noted above), but saying that the "analysis involves the application of a nine part test" and listing the *Riley* factors); *Berry*, 267 Ga. at 610-611 (applying a totality-of-the-circumstances test (as noted above), but saying that "[t]he analysis involves the application of the nine-part test outlined in *Riley*"); *Gilliam v. State*, 268 Ga. 690, 692 (492 SE2d 185) (1997)

27

(explaining that whether a juvenile knowingly and intelligently waived his constitutional rights is "assessed under the totality of the circumstances," but then "[a]pplying the nine-factor test" in *Riley*); *Hanifa v. State*, 269 Ga. 797, 804-805 (505 SE2d 731) (1998) (saying that "[s]ince Hanifa was a juvenile when she made the incriminating statement to police, the trial court correctly considered the nine factors set forth in *Riley* . . . in determining whether Hanifa made a knowing and intelligent waiver of constitutional rights," without mentioning the totality-of-the-circumstances test); *Nhek*, 271 Ga. at 246 (explaining that juvenile waiver is "assessed under the totality of the circumstances" (as noted above), but saying that the Court was "[a]pplying the nine-factor test of *McBride* and *Riley*"); *Brooks*, 271 Ga. at 876 (explaining and applying a totality-of-the-circumstances test (as noted above), but stating that *McBride* set "forth nine factors to be considered when [a] juvenile makes an incriminating statement"); *Jackson v. State*, 272 Ga. 191, 194 (528 SE2d 232) (2000) (noting that the trial court concluded that the juvenile knowingly and voluntarily waived his rights under the totality of the circumstances, but saying that "[t]he court specifically considered the factors set forth in *Riley* . . . , the test for considering the voluntariness of a juvenile's statement"); *Chapman v. State*, 273 Ga. 865, 870 (548 SE2d 278) (2001) (concluding that the trial court "did not err in finding that, considering the totality of the circumstances, Chapman knowingly and voluntarily waived his rights," but saying that a "court is to consider" the nine *Riley* factors and listing the factors); *Rodriguez*, 274 Ga. at 728-729 (explaining and applying a totality-of-the-circumstances test (as noted above), and listing the *Riley* factors as those "[a]mong the factors to be considered"); *James v. State*, 275 Ga. 387, 388 (565 SE2d 802) (2002) (concluding that the juvenile defendant knowingly and intelligently waived her rights "[c]onsidering the totality of the circumstances," but noting that the trial court "consider[ed] the nine factors set forth in *Riley*"); *Murray v. State*, 276 Ga. 396, 397-398 (578 SE2d 853) (2003) (concluding that the juvenile defendant's statement was knowingly and voluntarily given "[c]onsidering the totality of the circumstances," but quoting the *Riley* factors); *Norris*, 282 Ga. at 431-432 (citing *Fare* and applying a totality-of-the-circumstances test (as noted above), but quoting the factors listed in *Rodriguez* as those "[a]mong the factors to be considered"); *Green*, 282 Ga. at 673-674 (applying a totality-of-the-circumstances test to conclude that the juvenile knowingly and voluntarily waived his right to remain silent (as noted above), but listing and applying the *Riley* factors); *Allen*, 283 Ga. at 305-306 (applying a totality-of-the-circumstances test to determine whether the juvenile defendants knowingly and voluntarily waived their constitutional rights (as noted above), but saying

that "[t]he analysis involves the application of a nine part test" and listing the *Riley* factors); *Oubre v. Woldemichael*, 301 Ga. 299, 305-307 (800 SE2d 518) (2017) (applying *Riley* to determine whether a juvenile's statement was voluntarily made as a matter of due process and explaining that *Riley* requires an evaluation of the totality of the circumstances, but saying that "[i]n determining whether a juvenile has given a statement voluntarily, a court considers nine factors set forth in *Riley*"); *Lester*, 310 Ga. at 85-88 & n.7 (repeatedly explaining that juvenile waiver depends on the totality of the circumstances, but quoting the factors listed in *Riley* and noting that waiver under the *Riley* test differs from "a more general totality-of-the-circumstances due process analysis"); *Bedford v. State*, 311 Ga. 329, 334 (857 SE2d 708) (2021) (saying that the State bears the burden of showing that a juvenile waived his rights under "'the totality of the circumstances,'" but that "the court must consider nine factors in making that determination" and listing the *Riley* factors); *Daniels*, 313 Ga. at 406 (explaining that whether a juvenile defendant knowingly and voluntarily waived his rights depends on "the totality of the circumstances," but that "courts are to consider nine factors in making that determination" and then listing and analyzing the factors set forth in *Riley*); *Burton*, 314 Ga. at 641-649 (explaining that whether a juvenile waived his rights under *Miranda* depends on "the totality of the circumstances," but listing the *Riley* factors and reviewing the trial court's findings as to each factor); *Powell*, 315 Ga. at 12-14 (applying *Riley* to determine whether a juvenile's statement was voluntarily made as a matter of due process, noting that "in analyzing the totality of the circumstances, the trial court considered the many factors set forth in *Riley*," listing the nine factors, and then reviewing each of them).

In addition, we have said that the factors listed in *Riley* are inapplicable in cases involving whether an adult knowingly and voluntarily waived his constitutional rights. See *Andrews v. State*, 302 Ga. 809, 811 n.5 (809 SE2d 746) (2018), overruled on other grounds by *State v. Abbott*, 303 Ga. 297 (812 SE2d 225) (2018); *Sewell v. State*, 283 Ga. 558, 562 (662 SE2d 537) (2008); *Vergara v. State*, 283 Ga. 175, 177-178 (657 SE2d 863) (2008); *Woodard v. State*, 277 Ga. 49, 50 (586 SE2d 330) (2003); *Reynolds v. State*, 275 Ga. 548, 549 (569 SE2d 847) (2002); *King v. State*, 273 Ga. 258, 260 (539 SE2d 783) (2000); *Esposito v. State*, 273 Ga. 183, 185 (538 SE2d 55) (2000); *McDade v. State*, 270 Ga. 654, 656 (513 SE2d 733) (1999); *Hance v. State*, 245 Ga. 856, 858 (268 SE2d 339) (1980). To the extent that language in these or other Georgia appellate cases indicates that the test for whether a defendant has knowingly and voluntarily waived his rights under *Miranda* is not the same for juveniles

clear that Georgia trial courts should no longer look to that framework for determining, under the totality of the circumstances, whether a juvenile knowingly and voluntarily waived his rights under *Miranda*. Rather, as we have explained above, the totality-of-the-circumstances test requires trial courts to consider all of the relevant circumstances surrounding a juvenile's interview with law enforcement officials to determine whether the State has met its burden of showing that the juvenile knowingly and voluntarily waived his rights. See *Fare*, 442 U.S. at 725.

(c) We turn now to whether the trial court in this case applied the proper standard—the totality-of-the-circumstances test—to determine whether Clark knowingly and voluntarily waived his rights under *Miranda*. As explained below, nothing in the record indicates that the court failed to apply the test, so Clark does not prevail on this claim.

---

as it is for adults, that language is disapproved. See *Fare*, 442 U.S. at 725 (explaining that the totality-of-the-circumstances test is used for determining whether a juvenile has knowingly and voluntarily waived his constitutional rights, and that this same test is used for determining whether an adult has waived his rights).

(i) Near the beginning of the trial, the trial court held a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964), to determine the admissibility of the audio-recording of Clark's interview with the lead investigator. The evidence presented at the hearing, which included testimony from the investigator and the recording of the interview, showed the following. On the day after the shooting, the investigator spoke with Clark's mother, who said that she did not know where Clark was; around 6:45 p.m., Clark and Kelly turned themselves in at the Richmond County Sheriff's Office; and at 8:15 p.m., the investigator interviewed Clark for about an hour and 10 minutes. Clark, who was then 16 years old, attended high school and was in the tenth grade. He confirmed during the interview that he understood right from wrong; he understood English; and he did not have any "mental disorder" or take any drugs that would prevent him from understanding the investigator's questions. The investigator informed Clark that he and Kelly were being charged with murder. He then read to Clark the language that was contained on a "Waiver

31

of Counsel" form; Clark wrote his initials next to each of the six rights listed on the form and signed it.[17]

Clark initially denied any knowledge of the shooting, saying that he had not seen Kelly that night. During the course of the interview, Clark said that he had "been in trouble with the police" before, and he understood that giving a false statement to a police officer was against the law. At one point, Clark asked the investigator if he was going to be "locked up," and the investigator replied, "You have to be locked up for what happened. I have warrants on you." When the investigator said that telling the truth might "look[ ] good" if Clark "went to court," Clark mumbled

---

[17] The form advised Clark that he could "remain silent and [did] not have to make any statement at all"; "any statement which [he] might make" could "be used against [him] in court"; he had a "right to consult with an attorney before making any statements and to have such attorney present with [him] while [he was] making a statement"; if he did not have enough money to employ an attorney, he had "the right to have one appointed by the [c]ourt"; if he requested an attorney, "no questions [would] be asked until an attorney [was] present"; and he could decide "at any time to exercise these rights and not answer any questions or make any statements." Just above the date and signature lines, the form said, "I have read this Waiver of Counsel and fully understand it. No threats or promises have been made to induce me to sign this Waiver of Counsel."

something about "30 years," and the investigator said, "You don't know that." The investigator later asked if Clark knew the sentence for murder, and Clark replied, "Life."

About 35 minutes after the interview began, Clark said something like, "I [inaudible] talk to a lawyer."[18] The investigator asked, "Do what?" Clark again said something like, "I [inaudible] talk to a lawyer." The investigator said, "Are you saying you don't want to talk no more and you want to talk to a lawyer? Is that what you're saying?" Clark responded, "I'm saying I don't understand why you all got me for something I didn't do." The investigator then said that he had surveillance recordings showing Clark and Kelly together on the night of the murder. Clark again denied any involvement, and asked about the evidence the investigator had. When the investigator asked Clark to "tell the truth," he eventually admitted that he was present when Kelly fired at King and his companions, although he claimed that he fled when the shooting

---

[18] Clark's trial counsel argued at the hearing that Clark said, "I'll talk to a lawyer."

began.

The investigator testified at the hearing that during the interview, Clark did not appear to be intoxicated or suffering from any mental defects; he seemed to understand and coherently answer questions; no one had threatened him or promised him anything; and he did not ask to speak with his mother or any other family member. He also testified that the Richmond County Sheriff's Office had a special form used to advise juveniles of their rights under *Miranda*, but he did not use that form for Clark. In addition, he testified that about an hour and a half after the interview ended, Clark said that he wanted to change his statement, saying that Archie was the shooter. About five minutes later, Clark repeated that Kelly was actually the shooter and that he had tried to change his statement because he was "scared" of Kelly.

At the hearing, the parties argued about whether the investigator should have used the juvenile waiver-of-rights form and should have advised Clark that a parent could be present during the interview. They also argued about whether Clark unequivocally

invoked his right to counsel. In addition, the prosecutor asserted that Clark's comments during the interview showed that he was "well versed in the criminal justice system."

The trial court ruled that the recording of the interview was admissible. It concluded that Clark had not clearly invoked his right to counsel, pointing out that when the investigator tried to clarify whether Clark wanted to talk to a lawyer, Clark replied, "I'm saying I don't understand why you all got me for something I didn't do."[19] The court then stated that the investigator was not required to use a juvenile waiver-of-rights form and that Clark clearly "understood what was going on" and "understood the system." The trial court ruled that the State had shown by a preponderance of the evidence that Clark was advised of his rights under *Miranda*, understood them, and voluntarily waived them.

(ii) Nothing in the record suggests that the trial court failed to apply a totality-of-the-circumstances test. To the contrary, the record shows that the court reviewed the entire audio recording of

---

[19] Clark does not raise this issue on appeal.

the interview, which contained pertinent information regarding Clark's age, intelligence, education, previous experience with the criminal justice system, and understanding of his rights under *Miranda*. Moreover, during the hearing, the parties argued at length about whether a juvenile waiver-of-rights form should have been used, whether Clark should have been advised that a parent could be present during his interview, and whether Clark had clearly invoked his right to counsel when he mentioned "talk[ing] to a lawyer." The prosecutor also asserted that the recording of the interview, including Clark's comments about being "locked up" and potentially serving a sentence of "30 years" or "life" in prison for murder, showed that he was familiar with the criminal justice system.

In ruling that the recording of the interview was admissible, the trial court expressly concluded that a juvenile waiver-of-rights form was not required, that Clark had not invoked his right to counsel, and that he understood "what was going on" and understood the criminal justice "system." Although the court did not expressly

36

acknowledge other factors that may have been pertinent in analyzing the totality of the circumstances, "we generally do not require trial courts to make specific, on-the-record findings about each aspect of the totality of the circumstances they evaluate or to make 'explicit factual findings or credibility determinations on the record.'" *Lester v. State*, 310 Ga. 81, 86 (849 SE2d 425) (2020) (citation omitted).

In sum, we see no indication that the trial court failed to apply a totality-of-the-circumstances test in determining whether Clark knowingly and voluntarily waived his rights under *Miranda*. Clark's claim therefore fails.[20]  See *Holmes v. State*, 311 Ga. 698, 706 (859 SE2d 475) (2021) ("'Trial judges . . . are presumed to know the law and apply it in making their decisions, absent some indication in the record suggesting otherwise.'") (citation omitted).  See also *Drennon v. State*, 314 Ga. 854, 860 (880 SE2d 139) (2022)

---

[20] Because Clark contends only that the trial court applied the wrong legal test and does not contend that the court erred in concluding that he knowingly and voluntarily waived his constitutional rights under the proper test, we do not address that issue.

(explaining that when a trial court evaluates the general grounds as the "thirteenth juror," we presume that the court understood the nature of its discretion and exercised it, unless the record shows otherwise, even if the court did not explicitly speak of its discretion with respect to the general grounds).

4. Clark also asserts that the trial court committed plain error by failing to instruct the jury on knowledge, grave suspicion, mere presence, and mere association. These instructions were necessary, Clark says, to inform the jurors that in order to find him guilty as a party to the crimes against King, the jury would be required to determine that he shared a common criminal intent with Kelly. As Clark acknowledges, his trial counsel did not object to the omission of these instructions, so we review this claim for plain error only. To establish plain error, Clark must show that the alleged instructional error "'was not affirmatively waived; was clear and obvious, rather than subject to reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings.'" *Collins v. State*, 312 Ga. 727,

738 (864 SE2d 85) (2021) (citation omitted). "'An appellant must establish all four elements of the test in order to demonstrate plain error, so satisfying this test is difficult, as it should be.'" Id. (citation omitted). Because Clark has not met his burden of proving that the trial court clearly and obviously erred, or that any such error likely affected the outcome of his trial, he has failed to establish plain error.

In evaluating a claim that the trial court was required to give certain jury instructions, "'we view the charge as a whole to determine whether the jury was fully and fairly instructed.'" *Lopez v. State*, 310 Ga. 529, 537 (852 SE2d 547) (2020) (citation omitted). During the final charge, the trial court read the indictment to the jury and provided instructions on the presumption of innocence and the State's burden to prove beyond a reasonable doubt each essential element of the charged crimes. The court also instructed on felony murder and aggravated assault, saying, among other things, that felony murder "require[s] that the defendant possess the requisite criminal intent to commit the underlying felony" and that

39

aggravated assault requires "that the defendant intentionally committed an act which placed the alleged victim in reasonable fear of immediately receiving a violent injury." The court told the jury that "[i]ntent is an essential element of any crime and must be proved by the State beyond a reasonable doubt" and that "[Clark] will not be presumed to have acted with criminal intent." In addition, the trial court thoroughly and accurately instructed on parties to a crime, specifically telling the jury that a person may be convicted as a party to a crime if he intentionally aided or abetted in the commission of the crime or intentionally advised or encouraged another to commit the crime. Thus, the jury was fully informed that it was not authorized to find Clark guilty as a party to the crimes unless he shared Kelly's criminal intent to shoot King.

When evaluated in the context of the jury instructions as a whole, the trial court's failure to expressly instruct on knowledge, grave suspicion, mere presence, and mere association did not create a clear and obvious error beyond reasonable dispute with respect to the jury's understanding of criminal intent. See, e.g., *Adkins v.*

40

*State*, 314 Ga. 477, 483 (877 SE2d 582) (2022) (holding that the trial court did not err by failing to instruct the jury on grave suspicion, "because the concept was covered in other jury instructions"); *Downey v. State*, 298 Ga. 568, 574 (783 SE2d 622) (2016) (explaining that trial counsel was not ineffective for failing to object to the omission of a jury instruction on knowledge, because the charge as a whole sufficiently informed the jury of the knowledge required for a defendant to be convicted as a party to the crimes); *Simmons v. State*, 282 Ga. 183, 188 (646 SE2d 55) (2007) (holding that the trial court did not err by failing to instruct the jury on mere presence and guilt by association, because "mere presence is only a corollary to the requirement that the State prove each element of the crime charged, and . . . the trial court's instructions clearly informed the jury of this requirement").

For the same reason, Clark has not established that there is a reasonable probability that the outcome of the trial would have been more favorable to him had the trial court given these instructions. See *Downey*, 298 Ga. at 574-575. See also, e.g., *Walker v. State*, 311

41

Ga. 719, 724-725 (859 SE2d 25) (2021) (holding that an allegedly improper jury instruction did not likely affect the outcome of the appellant's trial under the third part of the plain-error test, because the charge as a whole adequately instructed the jury as to how to determine his guilt); *Cochran v. State*, 305 Ga. 827, 832 (828 SE2d 338) (2019) (holding that trial counsel's withdrawal of a requested jury instruction on mere presence did not prejudice the appellant, because other instructions sufficiently covered that point). Accordingly, Clark has not met his high burden of proving plain error.

5. Finally, Clark argues that his trial counsel provided constitutionally ineffective assistance by failing to request the jury instructions discussed above and by failing to file a demurrer to the indictment. To prevail on these claims, Clark must show that his lawyer's performance was constitutionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Clark must demonstrate that his counsel "'performed

at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms.'" *Lewis v. State*, 314 Ga. 654, 668 (878 SE2d 467) (2022) (citation omitted). See also *Strickland*, 466 U.S. at 688-689. To establish prejudice, Clark must show a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694; *Lewis*, 314 Ga. at 668. We need not address both components of the *Strickland* test if Clark makes an insufficient showing on one. See *Strickland*, 466 U.S. at 697; *Lewis*, 314 Ga. at 668.

(a) Clark first claims that his trial counsel provided constitutionally ineffective assistance by failing to request jury instructions on knowledge, grave suspicion, mere presence, and mere association. As we explained in Division 4 above, the trial court's omission of the instructions Clark now says should have been given was not an obvious or harmful error under plain-error review. Even if we assume that trial counsel performed deficiently by failing to request the instructions, Clark has not established that any such

43

deficiency resulted in prejudice, given that "'[t]he test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain error review.'" *Harris v. State*, 310 Ga. 372, 385 (850 SE2d 77) (2020) (citation omitted). This claim of ineffective assistance therefore fails.

(b) Clark also asserts that his trial counsel was constitutionally ineffective for failing to file a general demurrer to the felony-murder count in the indictment. Because counsel did not perform deficiently in this regard, Clark cannot succeed on this claim.

"'A general demurrer challenges the sufficiency of the substance of the indictment,' and asks whether it is capable of 'supporting a conviction.'" *Budhani v. State*, 306 Ga. 315, 319 (830 SE2d 195) (2019) (citation omitted). An indictment is void to the extent it fails to allege all of the essential elements of the charged crime. See id. To that end, an indictment is subject to a general demurrer "'[i]f the accused could admit each and every fact alleged in the indictment and still be innocent of any crime.'" Id. (citation

44

omitted).  If, on the other hand, the admission of the facts alleged in the indictment leads to the conclusion that the defendant is guilty of the charged crime, the indictment is sufficient.  See id.

The indictment charged Clark with felony murder "while in the commission of the felony of [a]ggravated [a]ssault" by "caus[ing] the death of . . . King . . . by shooting him with an unknown type handgun, a deadly weapon[.]"  This language substantially tracked OCGA § 16-5-1 (c), which defines "felony murder" as "caus[ing] the death of another human being irrespective of malice" while "in the commission of a felony."  And OCGA § 16-5-21 (b) provides that the crime of aggravated assault is a felony.  Thus, the felony-murder count in the indictment was sufficient to withstand a general demurrer, "because [Clark] cannot admit he caused the death of the victim while in the commission of aggravated assault and not be guilty of the crime [of felony murder]."  *Stinson v. State*, 279 Ga. 177, 179 & n.2 (611 SE2d 52) (2005) (holding that an indictment charging the appellant with felony murder by causing the death of the victim "'while in the commission of a felony, to wit: aggravated assault'"

was not subject to a general demurrer). See also *Smith v. State*, 313 Ga. 752, 758-759 (873 SE2d 142) (2022) (determining that an indictment charging the appellant with felony murder by causing the victim's death "'while in the commission of the offense of aggravated assault, a felony, and/or aggravated battery, a felony'" was sufficient to withstand a general demurrer).[21]

Clark nevertheless argues that the indictment was flawed because it did not charge him with a count of aggravated assault against King. Such a charge was necessary, he says, because aggravated assault was the felony that formed the basis of the felony-murder count. But it is well settled that "'[t]he crime of [felony] murder is independent of the underlying felony. Therefore, the underlying felony need not be charged as a separate substantive offense[.]'" *State v. Jones*, 274 Ga. 287, 288 (553 SE2d 612) (2001) (citations omitted). See also *Freeman v. State*, 297 Ga. 146, 150 (771 SE2d 889) (2015) (noting that OCGA § 16-5-1 (c) does "not require

---

[21] Clark does not argue that the indictment failed to contain the essential elements of the underlying crime of aggravated assault.

46

that the defendant be charged and convicted of the underlying felony. The jury must simply find that the defendant committed or attempted to commit it") (citation and punctuation omitted), overruled on other grounds by *Collier v. State*, 307 Ga. 363 (834 SE2d 769) (2019). Cf. *Smith*, 313 Ga. at 758-759 (determining that a one-count indictment charging the appellant with felony murder based on aggravated assault was sufficient to withstand a general demurrer); *Stinson*, 279 Ga. at 179 (same). Thus, the indictment was not defective in this respect.

Because a general demurrer to the indictment on the ground that it failed to charge Clark with aggravated assault would have been meritless, Clark has not shown that his trial counsel performed deficiently. See *Smith*, 313 Ga. at 759 (holding that trial counsel was not deficient for failing to file a general demurrer, because such a filing would have been meritless). Accordingly, he cannot prevail on this ineffective-assistance claim.

*Judgment affirmed. All the Justices concur.*

Decided January 18, 2023.

Murder. Richmond Superior Court. Before Judge Dickert, Senior Judge.

*Debra K. Jefferson*, for appellant.

*Jared T. Williams, District Attorney, Deborah Gonzalez, District Attorney Pro Tempore, Gerald L. Henderson, Assistant District Attorney; Christopher A. George; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.